CHANEY AND JAMES CONSTRUC-
TION COMPANY, Inc.

v.

The UNITED STATES.

No. 150–67.

United States Court of Claims.

Feb. 20, 1970.

H. Randall Bixler, Washington, D. C., attorney of record, for plaintiff; Hudson & Creyke, Washington, D. C., of counsel.

Edward M. Jerum, Washington, D. C., with whom was Asst. Atty. Gen., William

D. Ruckelshaus, for defendant; J. Michael Gottesman, of counsel.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DURFEE, Judge:*

This is a contract case involving a review, in accordance with the standards prescribed by the Wunderlich Act (41 U.S.C. §§ 321, 322 (1964)), of a decision that was rendered by the Federal Aviation Agency Contract Appeals Panel on January 6, 1967 (Docket No. 67–18). That decision passed upon claims for additional compensation which plaintiff had submitted under Contract No. FA1–1980 between plaintiff and defendant (represented by the Federal Aviation Agency).

Plaintiff and defendant have filed cross-motions for summary judgment in the present judicial proceeding, such motions being based upon the material contained in the administrative record.

Contract No. FA1–1980 ("the contract") was awarded to plaintiff by the Federal Aviation Agency on June 5, 1961. It called for the construction by plaintiff of an Air Traffic Control Center at Nashua, New Hampshire. Under the initial provisions of the contract, the project was to be completed within 349 calendar days from the effective date of the notice to proceed, and plaintiff was to receive $2,028,359.00 for its work. The notice to proceed was effective on June 26, 1961, and this fixed June 8, 1962 as the final date for the completion of the work under the contract. However, more than 100 change orders were issued during the course of the construction, the contract price was increased by $250,000.00, and the time for the completion of the work was extended beyond March 30, 1963,

which was the date on which defendant finally accepted the facility.

The several claims with respect to which plaintiff seeks judicial review of the administrative decision will be discussed in the order in which they are dealt with by the parties in their briefs.

### I—Roof Leader Drain

As part of the work called for by the contract, plaintiff was required to install a subsurface cast-iron roof leader drainage system, within subsurface space that was ultimately to be covered by the concrete floor of the basement underneath the administration wing of the Air Traffic Control Center.

On August 4, 1961, while plaintiff was in the process of laying the roof leader drain pipe at the elevation specified in the contract, a representative of the contracting officer directed that the elevation of the pipe be lowered approximately one foot. Compliance with this directive was begun by plaintiff on August 7, 1961.

On August 22, 1961, when the laying of the roof leader drain pipe at the new elevation was nearly completed, the contracting officer's representative decided that the directive of August 4 was wrong, and a new directive was issued requiring that the elevation of the pipe be raised approximately one foot, or back to the elevation originally specified in the contract. Plaintiff complied with the second directive, and the installation of the roof leader drain pipe was completed by August 31, 1961.

The contract contained, in paragraph 3 of the general provisions, the "changes" provision that is customarily included in Government construction contracts, authorizing the contracting officer to "make changes in the drawings and/or specifications of this contract and within the general scope thereof," and providing for "an equitable adjustment" if the changes caused "an increase or decrease in the amount due under this contract, or

---

* This opinion incorporates, with very minor changes, the opinion prepared by Trial Commissioner Mastin G. White, except with respect to Claims I, II, VII and VIII, as to which we differ from him in reasoning and result.

in the time required for its performance." Under this provision, a change order was issued by the contracting officer confirming the directives of August 4 and 22, 1961, relative to the elevation of the roof leader drain pipe. Pursuant to the change order, the time for the performance of the contract was extended, and plaintiff was compensated for the additional cost that it incurred in effecting the changes with respect to the elevation of the roof leader drain pipe.

Plaintiff submitted to the contracting officer—and subsequently to the FAA Contract Appeals Panel on appeal—an additional claim for an adjustment in the amount of $14,986.08 under subparagraph (d) of paragraph 6 of the supplemental general provisions of the contract. That subparagraph stated in part as follows:

> (d) * * * If * * * the performance of all or any part of the work is for an unreasonable period of time, suspended, delayed, or interrupted by an act of the Contracting Officer, in the administration of the contract, or by his failure to act * * * within a reasonable time * * *, an adjustment shall be made by the Contracting Officer for any increase in the cost of performance of the contract (excluding profit) necessarily caused by the unreasonable period of such suspension, delay, or interruption, and the contract shall be modified in writing accordingly. * * *

Plaintiff's additional claim under the "suspension of work" provision of the contract was denied by the FAA Contract Appeals Panel on the primary ground that, in the absence of unreasonable delay on the part of defendant's personnel in directing the changes with respect to the elevation of the roof leader drain pipe, plaintiff's remedy under the "changes" provision of the contract was exclusive.

In addition, the Panel determined on the basis of the evidence before it (received during the course of a 7-day hearing at Dallas, Texas) that the changes in connection with the elevation of the roof leader drain pipe actually "did not delay overall work progress."

■ Plaintiff contends, and defendant does not deny, that the delay was caused by an error in the specifications. It is well established that the Government warrants the adequacy of its plans and specifications to the extent that compliance with them will result in satisfactory performance. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952).

■ Where a contractor is delayed because the specifications are deficient, it is allowed to recover extra costs resulting from delay due to mistakes in the plans, and its recovery is not limited to an equitable adjustment for changes ordered to correct those mistakes. Laburnum Construction Corp. v. United States, 325 F.2d 451, 457–458, 163 Ct.Cl. 339, 349 (1963).

This same kind of recovery was awarded in Luria Bros. & Co. v. United States, 369 F.2d 701, 709, 177 Ct.Cl. 676, 690 (1966), where the court stated:

> Ordinarily, defendant is entitled to make necessary changes, *but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes,* as would be the case if the redesign were necessitated by a changed condition or the like. [Emphasis supplied.]

In both *Laburnum, supra,* and *Luria, supra,* the contractors were delayed and their costs were increased when the contracts were breached by virtue of their having been furnished with defective specifications. Moreover, *all* of the delay was compensable, not just the unreasonable part of the delay. Plaintiff here *is also contending that its delay was caused by defective specifications,* and thus seeks delay damages over and above the equitable adjustment it has already received.

What makes plaintiff's request novel is that it is seeking these damages under the Suspension of Work clause. Plaintiff seeks to incorporate into that clause the rationale of the *Laburnum* and *Luria* cases. For the reasons we are about to enunciate, we agree with plaintiff's contentions.

The Suspension of Work clause has two main functions: (1) it negates the notion that a contractor's exclusive remedy for delays caused by acts of the Government is a time extension, and (2) it provides an administrative remedy for losses and increased costs incurred by the contractor because of suspensions of work caused by the Government. This latter function is actually an administrative substitute for a breach of contract claim. Cannon Construction Company et al. v. United States, 319 F.2d 173, 179, 162 Ct. Cl. 94, 105 (1963).

This function has been previously described as follows:

\* \* \* \* \* \*

In the absence of a contract clause giving the Government the right to suspend the contractor's work or otherwise delay the contractor's performance, a work stoppage caused by the Government would ordinarily be a breach of contract giving rise to an action at law for damages, but a suspension of work caused by the Government is not a breach of contract when done pursuant to a right granted to the Government by the terms of the contract itself. T. C. Bateson Construction Company, 60–1 BCA ¶ 2552, p. 12,348 (March 16, 1960).

It cannot be gainsaid that the Government had the right, under the instant contract, to issue change orders. But the issuance of change orders does not cure what is otherwise a breach, as is shown by *Laburnum* and *Luria*. And since the Suspension of Work clause is an administrative substitute for an action at law for breach, *Cannon Construction, supra*, the contractor should be entitled to get the same relief under the clause that he could get in the absence of the clause if he sued for breach of contract.

If plaintiff had brought his present claim as a breach claim, under the rationale of *Laburnum* and *Luria,* it would not have had to prove the delay unreasonable, since all delay due to defective or erroneous Government specifications are *per se* unreasonable and hence compensable. The fact that the claim was brought under a contract clause does not affect the reasonableness of the delay. Here, since the delay was caused by erroneous or defective specifications, it too was unreasonable.

In holding that plaintiff should be compensated under the Suspension of Work clause, we are not creating a new remedy. The clause itself was not intended to increase the contractor's substantive rights.[1] We are also of the opinion that it was not intended to reduce the contractor's substantive rights. It would thus follow that if plaintiff could recover for *all* of the delay caused by defective specifications in an action at law for breach, it should be able to obtain a similar recovery under the contract.

The result which we favor is not only fair to the contractor, but it prevents fragmentation of remedies and thus furthers the legislative intent implicit in the adoption of a contract clause which converts a breach action into one under the contract. If we were to hold that all plaintiff was entitled to administratively was a time extension and an equitable adjustment, then it would have to sue for breach to recover its other costs of delay. Thus, two actions would be maintained instead of only one administrative action. In our view, this would be an undesirable result.

The Panel had an alternative ground for concluding that plaintiff could not recover additional compensation, namely, that the Government's error did not delay the overall work progress. This stand-

---

I. Seltzer and Gross, Federal Government Construction Contracts: Liability for Delays Caused by the Government, 25 Ford.L.Rev. 423, 446 (1956).

ard is erroneous, since the Suspension of Work clause states that if "all or *any part* of the work is, for an unreasonable period of time, suspended, delayed, or interrupted * * * an adjustment shall be made by the Contracting Officer for *any increase* in the cost of performance of the contract." [Emphasis supplied] Since we have concluded that part of the work was unreasonably delayed, the Panel should be given a chance to determine whether there was "any increase in the cost of performance of the contract."

For the foregoing reasons, it is concluded that plaintiff is legally entitled to recover for extra costs under the Suspension of Work clause, the amount to be determined initially by the Panel under the standard we have just enunciated.

## II—*Five Pump Drain*

The basement area underneath the administration wing of the Air Traffic Control Center contained a room in which a fire pump was to be located. The northwest corner of this room was designated in the original contract plans as the specific location for the fire pump.

Prior to the placement of the fire pump, it was necessary for plaintiff to install an 8-inch overflow drain pipe in the area designated as the location for the fire pump; and plaintiff proceeded to install this pipe in accordance with the contract drawings. Subsequently, while laying out details of the foundation pads and connections in the fire pump room, plaintiff discovered—and so advised personnel of defendant—that the northwest corner of this room would be too small to accommodate the fire pump.

It was then decided by the contracting officer that the fire pump should be placed on the opposite side of the room instead of in the northwest corner. By means of a letter dated September 7, 1961, a representative of the contracting officer directed plaintiff to relocate the 8-inch overflow drain pipe in the new area selected for the fire pump; and on September 12, 1961, such representative

directed that a 3-inch drain be installed in the original location of the 8-inch drain. These items of work were accomplished by plaintiff. A change order, together with a modification thereof, extended the time for the performance of the contract and compensated plaintiff for its additional cost in making these changes.

Plaintiff submitted to the contracting officer—and subsequently to the FAA Contract Appeals Panel on appeal—an additional claim in the amount of $4,162.-80 for an adjustment under the "suspension of work" provision of the contract discussed in the preceding part of this opinion.

In denying this claim, the FAA Contract Appeals Panel said that "the Government had a reasonable time from the discovery of the error to direct corrective changes without liability under the Suspension of Work Clause"; and that plaintiff had "not shown any unreasonable delay in this respect."

The Panel further determined that the changes respecting the fire pump drains actually did not constitute a delaying factor in connection with other aspects of the work.

Since plaintiff's instant claim involves precisely the same legal issues as the roof leader drain claim, we hold that here as well plaintiff is entitled to an adjustment for delays caused by defective specifications, with the amount to be determined initially by the Panel.

## III—*Underground Fuel Tank*

The contract required plaintiff to install an underground fuel tank, having a capacity of 12,000 gallons, outside of the main building but in the vicinity of the boiler room. The tank, which was to provide storage for the fuel oil needed to fire the heating boilers inside the building, was to be placed in a concrete vault. It was anticipated that after the tank was installed in the vault, the normal sequence of the related work would involve backfilling the vault with clean sand to the level of the tank, form-

ing the manholes, further backfilling with sand to grade level, and then pouring a concrete pad over the vault.

Plaintiff submitted a tank drawing for approval on September 8, 1961. That drawing, which indicated a tank with two manholes, was rejected on September 15, 1961, with a notation indicating that plaintiff should "provide additional connections shown on Sheet 25." On October 16, 1961, plaintiff forwarded another drawing of the fuel tank for approval, such drawing also indicating a tank with two manholes. The second drawing was disapproved on November 1, 1961, with the notation "Three manholes are required as per contract drawing." By means of a letter dated November 22, 1961, the contracting officer's representative informed plaintiff that the contract required a tank having three manholes, and plaintiff was directed to submit a drawing in compliance with that requirement.

Plaintiff, although protesting against the directive of November 22, 1961, revised the tank drawing to show three manholes, and re-submitted it on December 6, 1961. The third submittal was approved, whereupon plaintiff proceeded with the installation of the fuel tank and completed this phase of the job by December 14, 1961.

The contracting officer subsequently recognized that the original contract provided for a fuel storage tank with two manholes, instead of three; and a change order was issued, extending the time for the performance of the contract and compensating plaintiff for the additional cost incurred in providing a fuel tank with three manholes.

Plaintiff submitted an additional claim in the amount of $24,976.80 under the "suspension of work" provision of the contract. This claim was denied by the contracting officer and, on appeal, by the FAA Contract Appeals Panel.

In rejecting the fuel tank claim, the FAA Contract Appeals Panel said that although defendant "exceeded what could be considered a reasonable time to approve the contractor's drawing for the 12,000-gallon tank," plaintiff was not entitled to an adjustment under the "suspension of work" provision because defendant's delay in approving the tank drawing "had no delaying effect on the overall completion of the building or the furnishing of heat to the building." The delay in the installation of the tank itself, in the backfilling of the vault, in the running of pipes, and in the covering of the vault with a concrete pad was noted by the Panel but evidently was regarded as immaterial.

We have already stated, in discussing Claims I and II, that the applicable standard is whether "any part" of the work was delayed for an unreasonable period of time. Thus, the standard applied by the Panel was incorrect, and it should therefore have determined whether there was "any increase in the cost of performance of the contract." ·

Defendant says in its brief that inasmuch as plaintiff contended before the Panel that defendant's unreasonable delay in approving the fuel tank drawing had a delaying effect on the overall completion of the building, plaintiff is precluded from recovering in the present action on a different claim relative to delay occurring only in connection with part of the project. This does not appear to be a sound defense. Plaintiff is asserting in the present action basically the same claim that it presented to the Panel, i. e., a claim for increased cost caused by unreasonable delay to work under the contract due to defendant's handling of the fuel tank drawing.

The circumstances that plaintiff may have overstated the consequences flowing from defendant's handling of the fuel tank drawing when plaintiff contended in the administrative proceeding that the overall completion of the building was delayed does not justify the conclusion that plaintiff, in attempting to recover now on the basis of delay to only part of the project, is asserting a different claim not previously submitted to the administrative agency.

It is concluded that plaintiff is entitled to recover on the fuel tank claim, since it is reasonable to infer that the delay in the installation of the fuel tank, in the backfilling of the vault, in the running of pipes, and in the covering of the vault with a concrete pad caused some increase in plaintiff's cost of performing the contract.

As the Panel did not originally determine the extent to which the contract price should be adjusted under the "suspension of work" provision on the basis of plaintiff's fuel tank claim, it should now be allowed to make an initial determination concerning the amount of the adjustment.

### IV—*Lath and Plaster Work*

■■ By March 1962, the construction of the Air Traffic Control Center had reached a point where it was possible to start some work inside the building. Consequently, plaintiff notified its plastering subcontractor to commence the installation of the metal lath and plaster in the administration wing of the building on March 12, 1962. However, the Federal Aviation Agency was contemplating certain changes in the finished decor of the building, and on March 13, 1962, a representative of the contracting officer orally ordered plaintiff to stop work on 17 different items, including the plaster walls in the lobby of the administration wing of the building and all the plaster and acoustical ceilings in the administration wing. This oral order was confirmed by means of a written stop order dated March 22, 1962 from the contracting officer. The stop order was rescinded on June 11, 1962 with respect to the plaster and acoustical ceilings in the administration wing, but it remained in effect as to the plaster walls in the lobby of that wing until a later date.

In considering plaintiff's claim for an adjustment under the "suspension of work" provision of the contract with respect to the delay in the lath and plaster work occasioned by the stop order, the Panel said that it was permissible for defendant to "suspend the work for a reasonable time to consider possible changes." After analyzing the evidence before it, the Panel concluded, in effect, that part of the delay incident to the stop order on the lath and plaster work was in the category of reasonable delay, but that 55 days of the delay constituted "an unreasonable period of time" that warranted an adjustment under the "suspension of work" provision of the contract. The Panel allowed plaintiff an upward adjustment of $35,129.25 in the contract price for the 55 days of compensable delay. The sum of $35,129.25 was subsequently paid to plaintiff.

Plaintiff says that the Panel was "in error as a matter of law in allowing the Government a 'reasonable' time in which to consider a change under circumstances where the contractor is ready to proceed with the critical work in a facility." In this connection, plaintiff contends that the entire period between March 22, 1962 (when the stop order was issued) and June 11, 1962 (when the stop order was largely rescinded as to the lath and plaster work), plus the period between June 11 and July 11, 1962 (the day before the lath and plaster work was resumed in the administration wing of the building), constituted "an unreasonable period of time" that was compensable under the "suspension of work" provision of the contract.

As has been stated previously, the "suspension of work" provision of the contract distinguishes between a reasonable period of delay and an unreasonable period of delay. It is only in the less common situations, such as those in which the delay is due to defective specifications, that *all* of the delay is unreasonable. Consequently, not all of the delay resulting from the issuance of the stop order in connection with the lath and plaster work was necessarily unreasonable, even though plaintiff was at a critical stage of the work when the stop order was issued.

Plaintiff takes a secondary position to the effect that, in any event, the part of the administrative decision which determined that the unreasonable portion of

the delay was limited to 55 days is not entitled to finality under the first section of the Wunderlich Act (41 U.S.C. § 321) because "it is arbitrary and not supported by substantial evidence." The rather scanty portions of the administrative record cited by plaintiff in its brief as supporting this statement have been carefully examined. They do not refute the administrative determination to which plaintiff objects.

It must be concluded, therefore, that plaintiff has failed to show an entitlement to recover under the "suspension of work" provision of the contract for any period of delay in excess of 55 days on the lath and plaster claim.

## V—Lighting Fixtures

The stop order of March 22, 1962, which was discussed in the immediately preceding part of this opinion, stopped work (among other items) on the lighting fixtures for the recessed ceiling lights in the lobby and vestibule of the administration wing of the building. By means of a letter dated April 2, 1962, plaintiff advised defendant that it had already ordered Sunlight fixtures for such areas, that the fixtures were of special manufacture, and that they would not fit any other job.

No action was taken by defendant respecting this matter until June 11, 1962, when a change order was issued which directed that the lighting fixtures be changed to Lightolier Fixture No. DS–8301. An attempt was made to procure the new fixtures, but it was discovered—and plaintiff so informed defendant on August 17, 1962—that Lightolier Fixture No. DS–8301 was a new design, and would not be put into production until October 1962. Plaintiff proposed that a substitute fixture, Lightolier 7719/7747 be approved. Plaintiff's proposal was approved on August 30, 1962, the substitute fixtures were delivered to the job site on September 21, 1962, and the installation of such fixtures was completed on September 26, 1962.

Plaintiff submitted a claim in the net amount of $30,804.72 under the "suspension of work" provision of the contract for a portion of the delay incident to the change in the lighting fixtures. (Plaintiff recognized that some of the delay incident to the lighting fixtures was concurrent with the period of delay involved in plaintiff's lath and plaster claim; and, therefore, plaintiff did not seek compensation in its lighting fixtures claim for that particular period of delay).

The Panel denied plaintiff's lighting fixtures claim on the ground that this change did not have any delaying effect on "the overall completion of the building."

In order to establish an entitlement to recover on the lighting fixtures claim under the "suspension of work" provision of the contract, it was not necessary for plaintiff to show that the work stoppage and change in the lighting fixtures for the lobby and vestibule of the administration wing of the building had an adverse delaying effect on the overall completion of the building. As noted in another part of this opinion, it was sufficient for plaintiff to show that the change in the lighting fixtures delayed the performance of "any part" of the work—including the installation of the lighting fixtures themselves—for an unreasonable period of time, and that such delay increased plaintiff's cost of performing the contract.

It appears from the portions of the administrative record cited by the parties that the long period between March 22, 1962 (when the stop order relative to the lighting fixtures was issued) and September 26, 1962 (when the installation of the substitute lighting fixtures was finally completed pursuant to a change order) involved—at least in substantial part— "an unreasonable period" of delay with respect to part of the work, and that this had some adverse effect on plaintiff's cost of performing the contract. Consequently, plaintiff is entitled to recover on its lighting fixtures claim.

Defendant contends that since plaintiff alleged in the administrative proceeding

that the entire project was delayed as a result of the work stoppage and change order relative to the lighting fixtures, plaintiff is precluded from attempting to recover in the present action on the basis of delay to part of the project. Defendant's contention is untenable for the reasons stated in discussing a similar contention made by defendant with respect to the fuel tank claim.

It is not feasible in the present review proceeding to determine in the first instance the amount of the adjustment in the contract price that should be made on the basis of plaintiff's lighting fixtures claim.

### VI—4,000-Ampere Bus Duct

■ As part of the electrical work under the contract, plaintiff was required to furnish a 4,000-ampere bus duct, consisting of flat copper bars approximately 4 inches wide and ¼-inch thick, enclosed in a metal housing. On September 20, 1961 plaintiff submitted a drawing of this duct for approval. In the absence of any action by defendant, plaintiff wrote follow-up inquiries on October 31, November 20 and December 29, 1961. On January 10, 1962, the drawing of the bus duct was disapproved, and defendant indicated at that time—and more completely on January 17, 1962—certain changes in the drawing that were desired by defendant.

Plaintiff again submitted a drawing of the bus duct on May 21, 1962. This submittal was disapproved by defendant on June 13, 1962, without any indication of the reason for the disapproval on this occasion.

At a subsequent meeting that was held on August 10, 1962 between representatives of plaintiff and defendant, certain changes in the bus duct drawing were agreed upon. Plaintiff once more submitted a drawing of the bus duct on August 27, 1962. It was approved by defendant, and the bus duct was completely installed by September 20, 1962.

Contending that defendant had delayed action on the bus duct drawing for an un-

reasonable period of time, plaintiff submitted a claim in the net amount of $104,154.12 under the "suspension of work" provision of the contract in connection with this matter. Plaintiff supported this claim by asserting that the unavailability of the bus duct until September 20, 1962 caused a delay in getting permanent electrical power into the building, thereby delaying the work of the electrical and mechanical subcontractors. Plaintiff makes the same contention before the court.

The Panel impliedly conceded that there was unreasonable delay on the part of defendant in acting on the bus duct drawing. However, the Panel determined that even if the bus duct had been available earlier than September 1962, plaintiff still would have been unable to get permanent power into the building until September 1962 because certain switch gear which was essential to the operation of the electrical system in the building, and which plaintiff was to install under the contract, was defective when delivered to the job site and was inoperable until the defects were corrected in August 1962, and the switch gear was installed in September 1962.

In denying the bus duct claim, the Panel relied upon the portion of the "suspension of work" provision of the contract which stated that:

* * * No adjustment shall be made to the extent that performance by the Contractor would have been prevented by other causes even if the work had not been so suspended, delayed, or interrupted. * * *

The evidence in the administrative record on the question of whether the related switch gear was or was not inoperable until September 1962 because of defects is conflicting.

Testimony introduced by defendant at the hearing before the Panel was to the effect that the switch gear was delivered to the job site in February 1962; that a visual inspection was made within two weeks and various deficiencies were noted; that the deficiencies were brought to

the attention of plaintiff immediately; that the supplier of the switch gear sent personnel to the job site in about August of 1962 for the purpose of repairing the equipment; that the switch gear was not in an operating condition until the repairs were made; that the repairs had been completed and the switch gear was installed by September 20, 1962; and that if the bus duct had been installed prior to September 1962, it could not have been used for the purpose of providing permanent power to the building, but only for the purpose of making power available to certain nearby equipment.

On the other hand, testimony introduced by plaintiff at the administrative hearing with respect to the switch gear was to the effect that it was operable at all times after its delivery to the job site, although there were some problems in connection with the circuit breakers. The inference to be drawn from the testimony introduced by plaintiff was that, despite the problems with regard to the circuit breakers in the switch gear, it could have been used to provide permanent power for the building at any time after its delivery to the job site, and that the unavailability of permanent power in the building prior to September 1962 was due solely to the delay in the installation of the bus duct.

The evidence on either side with respect to the inoperable or operable condition of the switch gear prior to September 1962 might be accepted by a reasonable person as sufficiently persuasive to represent the true situation. That being so, it must be concluded that the administrative determination on the point under discussion, which was based on the testimony presented by defendant, is supported by substantial evidence and, therefore, is binding on the court under the first section of the Wunderlich Act (41 U.S.C. § 321). In such a situation, the court is inhibited by the first section of the Wunderlich Act from independently weighing the conflicting evidence in the administrative record for the purpose of ascertaining where the preponderance of the evidence lies.

Consequently, the action of the Panel on the bus duct claim must be sustained. It is not necessary to discuss alternative reasons given by the Panel for its adverse action on this particular claim.

## VII—Roof Washdown System

The roof washdown system is a piping system which runs from a pump in the basement of the building to the roof, with pipe leaders and sprinklers running the length of the roof. The system is used to spray water over the roof area and wash it clean.

Soon after plaintiff's mechanical subcontractor began erecting pipe supports on the roof as part of the installation of the roof washdown system, it became apparent that there was a discrepancy in the drawings relative to the roof portion of the system. This was called to defendant's attention on February 16, 1962. No response having been received from defendant, plaintiff wrote to defendant again on April 9, and once more on April 16, 1962, advising defendant that work had been stopped on the roof washdown system.

On April 18, 1962 the contracting officer sent plaintiff a telegram stating that revised drawings for the roof washdown system were being forwarded on the same date and that a change order would follow. Not having received the change order by May 4, 1962, plaintiff on that date sent a telegram to defendant asking for information concerning the status of the change order. Soon thereafter, plaintiff received the promised change order and resumed work on the roof washdown system.

Plaintiff filed a claim in the amount of $13,454.00 under the "suspension of work" provision of the contract because of defendant's delay in correcting the erroneous drawings relative to the roof washdown system.

The Panel said that although defendant "had a reasonable time after discovery of the error in which to correct the deficiency," defendant nevertheless "exceeded what could be considered a reasonable time to make the necessary

changes, by 31 days." However, the Panel denied plaintiff's claim respecting the roof washdown system on the ground that plaintiff had failed to establish "that the delay to the roof washdown system delayed completion of the facility."

As we have stated previously, delay caused by design deficiencies, being *per se* unreasonable, is *all* compensable. Thus, plaintiff's recovery should not be limited to 31 days, but should cover the entire 61 days of delay. Moreover, the Panel committed additional error by not using the correct standard of whether "any part" of the work was delayed, and instead, used the wrong standard of whether the *overall* completion of the facility was delayed.

The portions of the administrative record cited by the parties warrant the inference that plaintiff's cost of performing the contract was increased to some extent as a result of the unreasonable delay caused by defendant in connection with the installation of the roof washdown system. Accordingly, plaintiff is entitled to recover on this claim.

Defendant again argues that since plaintiff contended before the Panel that the delay in correcting the erroneous drawings relative to the roof washdown system affected the project as a whole, plaintiff is precluded from recovering in the present action on the basis of delay occurring in connection with part of the work. For the reasons stated in discussing a similar contention made by defendant relative to the fuel tank claim, the argument made by defendant on this point cannot be sustained.

As indicated in other parts of this opinion, the Panel should now be allowed to make an initial determination concerning the amount of the adjustment to which plaintiff is entitled on this claim.

VIII—*Exposure to Winter Weather*

■ In addition to the several specific claims which plaintiff filed under the "suspension of work" provision of the contract, as indicated in the preceding parts of this opinion, plaintiff also filed a general claim under the same contract provision. This general claim was based upon the allegation that the various delays attributed to defendant in connection with the several matters mentioned in the specific claims made it necessary for plaintiff to perform construction work under conditions of exposure to the weather during the winter of 1961–1962.

It was plaintiff's contention that it had originally expected to enclose the building by November 26, 1961, so that laborers working inside the building during the ensuing winter months could be protected from the weather, but that it was unable to enclose the building until a later time because of the several delays attributed to defendant. The result, according to plaintiff, was that laborers had to work under conditions of exposure to extremely cold weather during the winter of 1961–1962, and that this greatly lowered their efficiency.

In rejecting this general claim, the Panel said that "We cannot find that unreasonable Government suspensions, delays or disruptions within the meaning of the Suspension of Work Clause, independently delayed enclosing the building before the winter of 1961–1962, causing the work inefficiencies which are the basis of this claim." (citation omitted).

In making its conclusion that there were no unreasonable suspensions, delays or disruptions which independently delayed enclosing the building, the Panel did not consider the delays under Claims I and II, and the extra delay under Claim VII, which we have found to be unreasonable *per se*. Accordingly, Claim VIII should be reconsidered by the Panel initially in light of our determination as to the existence of unreasonable delays in Claims I, II and VII, to determine whether any part of the delay in enclosing the building was due to the fault of the Government, and if so, how much is compensable under the Suspension of Work Clause.

## IX—Amount of Adjustment

■ Plaintiff contends that the Panel committed several errors in computing the amount of the contract adjustment to which plaintiff was entitled under the "suspension of work" provision on the basis of the 55-day period of delay previously mentioned in connection with the lath and plaster claim. It seems to be plaintiff's theory that the Panel disregarded "general business accounting practices in the classification of ordinary and necessary business expenses" when the Panel disallowed certain items of expense contained in the accounts of plaintiff and its subcontractors.

The items which the Panel erroneously (according to plaintiff) disallowed are identified in plaintiff's brief, but the brief does not cite any portions of the administrative record as showing that the particular items of expense had such a relationship to the performance of the work under the contract that the Panel, in accordance with recognized accounting principles, should have taken them into account when determining the amount of the contract adjustment to which plaintiff was entitled. In the absence of such references, it is not feasible to undertake an examination of the voluminous record in a search for pertinent evidence. *Cf.* Commerce International Co. Inc. v. United States, 338 F.2d 81, 89, 167 Ct.Cl. 529, 542, 543 (1964); Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968–969, 173 Ct.Cl. 180, 199 (1965).

The determination by the Panel with respect to the amount of the adjustment for the 55-day period of delay is presumptively correct, and it must be sustained on that basis.

## X—Adjustments Under "Changes" Provision

■ In addition to calling upon the court to review the decision made by the Panel on certain "suspension of work" claims, plaintiff also asks the court to review the administrative decision insofar as it rejected a claim by plaintiff for a further equitable adjustment in connection wtih numerous change orders. Plaintiff says, in this connection, that the equitable adjustments granted to plaintiff in the change orders were based upon improper percentages as to overhead for plaintiff and its mechanical and electrical subcontractors.

As change orders were issued during the progress of the work, plaintiff and defendant were unable to agree on ,the proper percentages for overhead and profit. Consequently, the change orders contained tentative allowances respecting these matters, but provided that the allowances for overhead and profit would be subject to further negotiations.

Subsequently, on May 8, 1963—which was after the work under the contract was completed—plaintiff and defendant entered into a supplemental agreement to the contract, designated as Change Order No. 93. In this change order, the parties mutually agreed on the percentages for overhead and profit which plaintiff and its subcontractors should be allowed in connection with change orders previously issued. The supplmental agreement further provided as follows:

> * * * an increase of $15,090.89 in the contract price represents a lump sum adjustment of all change orders indicated on the attached schedule, and the contractor hereby releases the Government, its officers and agents, from any or all claims or demands for further additional compensation for overhead and profit allowances, in connection with said change orders.

In view of the plain release executed by plaintiff with respect to "any or all claims or demands for further additional compensation for overhead and profit allowances, in connection with said change orders," plaintiff's present claim for a further adjustment as to overhead in connection with the various change orders must be denied.

■ Perhaps this would be an appropriate place to mention that defendant, in an amended answer, asserts that the supplemental agreement of May 8, 1963 should also be regarded as a release or

an accord and satisfaction barring plaintiff from presenting certain of the "suspension of work" claims that are discussed in other parts of this opinion. However, the language of the May 8, 1963 release limited its effect to claims "for further additional compensation for overhead and profit allowances, in connection with said change orders."

Furthermore, the reference in the supplemental agreement to "profit" showed that it was not intended to apply to claims under the "suspension of work" provision of the contract, since that provision expressly excluded profit in determining the amount of an adjustment on such a claim.

Accordingly, the supplemental agreement of May 8, 1963 is inapplicable to any of the "suspension of work" claims discussed in other parts of this opinion.

## XI—15–KV Cable

■ Plaintiff contends that the Panel erred in refusing to recognize the replacement of a 15-kilovolt cable as a constructive change requiring an equitable adjustment under the "changes" provision of the contract.

Under the contract, as revised, plaintiff was called upon to supply and install a 15-kilovolt cable meeting certain specifications. This cable was to constitute the main connection with local electric power for the Air Traffic Control Center. Accordingly, plaintiff in September 1962 installed approximately 500 feet of cable in order to provide the necessary connection. Plaintiff certified that this cable met the requirements set out in the contract specifications.

On November 18, 1962, the cable failed due to a short circuit. Defendant thereupon directed plaintiff to replace the cable, and this was done. Plaintiff subsequently presented a claim under the "changes" provision of the contract for the cost involved in making the replacement and the cost of supplying a temporary power line. This claim was denied by the Panel.

The administrative record contains the testimony of an electrical engineer employed by the Federal Aviation Agency, and it also contains a report that was prepared by the National Bureau of Standards on the basis of tests which that agency conducted on some cable which was left over at the time when the 500-foot segment was installed in September of 1962. (None of the 500-foot segment of cable which failed and was then removed could be tested by the National Bureau of Standards because such segment had been returned to, and destroyed by, the manufacturer). The testimony of the FAA electrical engineer was unquivocally to the effect that the cable specified in the contract was suitable for the use to which it was put. The report by the National Bureau of Standards was inconclusive.

The administrative record also contains evidence presented by plaintiff to the effect that the damaged cable was returned to the manufacturer; that the manufacturer tested it and submitted a report, with test data, showing that the cable met the contract specifications; that the manufacturer engaged a professional engineer to conduct an investigation concerning the failure of the cable, and that the engineer concluded that the failure was caused by voltage surges due to instability in power transmission, and that the cable insulation specified in the contract was not heavy enough to withstand the voltages to which it was subjected.

The Panel weighed the evidence and determined "that the cable failure resulted from improper manufacture, handling or installation and not from any fault in the Government's specifications."

It appears that a reasonable person might have been persuaded by the testimony of the FAA electrical engineer into concluding that the cable specified in the contract was suitable for the use to which it was put and, therefore, that the failure of the cable in November 1962 must have been due to improper manufacture, handling, or installation. On the other hand, a reasonable person might have regarded plaintiff's evidence as sufficiently persuasive to justify the

conclusion that the failure of the cable in November 1962 was attributable to deficiencies in the contract specifications, and not to improper manufacture, handling, or installation. This being so, a finding either way would have been supported by substantial evidence.

Since the Panel elected to accept defendant's evidence as more persuasive than plaintiff's evidence, its determination on this issue cannot be upset by the court. Here again, because of the inhibiting language used in the first section of the Wunderlich Act (41 U.S.C. § 321), it is not permissible for the court to weigh the evidence independently in order to determine where the preponderance lies.

Therefore, plaintiff is not entitled to recover on the claim relative to the 15–KV cable.

## CONCLUSION

For the reasons stated in the preceding parts of this opinion, plaintiff's motion for summary judgment is partially allowed with respect to Claims I, II, III, V and VII, the amount of recovery to be determined under Rule 131(c) after allowing the Federal Aviation Agency Contract Appeals Panel a period of not to exceed 90 days within which to make initial determinations concerning the amounts of the contract adjustments on the five claims mentioned (unless the parties waive such initial determinations).

As to Claim VIII, we are also suspending action for 90 days pending an initial determination by the Panel as to whether the enclosing of the building was delayed by the Government, in light of the additional delays which we have found were caused by the Government in Claims, I, II and VII, and if so, how much is compensable under the Suspension of Work Clause.

Plaintiff is not entitled to recover on the other claims asserted in the petition, defendant's cross-motion for summary judgment is partially allowed respecting such claims, and the petition is dismissed as to such claims.