**COMMERCIAL CONTRACTORS, INC., Plaintiff,**

**v.**

**The UNITED STATES, Defendant.**

**No. 648–89C.**

United States Court of Federal Claims.

Oct. 15, 1993.

Richard D. Corona, San Diego, CA, for plaintiff.

Lauren S. Moore, Washington, DC, with whom was Asst. Atty. Gen. Stuart M. Gerson, for defendant.

## OPINION

HARKINS, Senior Judge:

Plaintiff, Commercial Contractors, Inc., on August 25, 1987, was awarded a firm fixed price contract for $1,005,000 on a formally advertised IFB by the Army Corps of Engineers (Corps) for reconstruction of an existing runway and overrun at Libby Army Airfield in Fort Huachuca, Arizona. The procurement was a 100 percent small business set-aside. Work was to be commenced within 5 calendar days and completed within 180 days after receipt of the Notice to Proceed (NTP). The NTP was issued on October 26, 1987, was received on November 2, 1987, and contract work began on November 11, 1987. The contract documents were modified 12 times by P00001 through P00012. The reconstruction work was completed, and the project was accepted by the Government as of July 13, 1988. As modified, the contract completion date was May 30, 1988; the final contract price was $1,019,302, and the total performance period was 253 days. Plaintiff was assessed $17,160 in liquidated damages for 44 days.

On February 13, 1989, plaintiff submitted to the Contracting Officer (CO) a request for a change order to cover three periods of delay that totaled 91 days and amounted to $57,321.06. On May 9, 1989, plaintiff's request was amended to include a refund of assessed liquidated damages and duly certified as a claim under the Contract Disputes Act. As amended, plaintiff's claim totaled $74,481.06.

Plaintiff accepted the final pay estimate and executed the contractor's release on June 30, 1989. The parties, in the closing documents, reserved rights as to plaintiff's pending claim as follows:

> This final pay estimate does not prejudice the contractor's right to proceed with its claim in the amount of $74,-481.06, submitted to contracting officer by letter dated 9 May 89. Government does not waive any claim it may have arising out of the subject matter of the claim accepted by the contractor.

Plaintiff has been paid the amount of the final pay estimate, $1,019,302. On November 21, 1989, the CO issued a decision that denied plaintiff's three delay claims. The decision, without explanation, ordered return of the $17,160 that had been assessed for liquidated damages. A check in that amount was issued on December 13, 1989.

---

In this court, the amended complaint and posttrial briefing claims damages for delays under the Suspension of Work clause in the contract. FAR 52.212–12. The delays involve three separate categories of government actions and separate time periods. The subject matter of the three delay periods is: (1) alleged failure to issue timely the notice to proceed (NTP), (2) unavailability of the work site for contract work that resulted from design oversight, and (3) additional testing of asphalt-in-place.

Unavailability of the work site (No. 2) and additional testing (No. 3) have been considered under summary judgment procedures. Defendant contended that these claims were included in contract changes No. P00002 (Mod 2) and No. P00006 (Mod 6) and had been resolved under the doctrine of accord and satisfaction. Defendant's motion for partial summary judgment was denied because material issues of fact were in dispute with respect to the subject matter of negotiations on the changes and the scope of resulting modifications. *See Commercial Contractors, Inc. v. United States*, 25 Cl.Ct. 666 (1992).

Before the CO and in this court, plaintiff's claims have included substantial variations as to delay times and dollar damages. Although the subject matter of the claims has not changed, the time periods have ranged from a total of 91 days to 107 days, and claimed dollar damages have ranged from $57,321.06 to $220,984. These variations are shown on the following table.

| | To Contracting Officer (2/13/89) & (5/19/89)* | | | Complaint 11/29/89 | | |
|---|---|---|---|---|---|---|
| Claim | Period | Days | Dollars | Period | Days | Dollars |
| (1) Late NTP | 9/17–10/27/87 | 41 | 29,630.87 | 9/27–11/2/87 | 36 | (NS) |
| (2) Site Availability | 10/28–11/11/87 | 15 | 10,840.56 | 11/6–11/10/87 | 4 | (NS) |
| (3) Asphalt Testing | 1/19–2/23/88 | 35 | 16,849.63 | 1/19–2/23/88 | 35 | (NS) |
| Subtotal | | 91 | 57,321.06 | | 75 | |
| Liquidated damages* | | 44 | 17,160.00 | | 44 | |
| Total | | 135 | 74,481.06 | | 119 | 74,481.06 |

| | Amended Complaint 5/7/90 | | | Posttrial | | | |
|---|---|---|---|---|---|---|---|
| Claim | Period | Days | Dollars | Period | Days | Dollars (sched) | Dollars (actual) |
| (1) Late NTP | 9/27–11/2/87 | 36 | (NS) | 9/27–11/2/87 | 36 | 72,972 | 69,660 |
| (2) Site Availability | 11/2–11/10/87 | 8 | (NS) | 11/3–11/10/87 | 8 | 16,216 | 15,480 |
| (3) Asphalt Testing | 1/19–2/23/88 | 35 | (NS) | 1/19–3/23/88 | 63 | 131,796 | 126,126 |
| Subtotal | | 79 | | | 107 | | |
| Liquidated damages* | | 44 | | | 0 | | |
| Total | | 123 | 196,482.00 | | 107 | 220,984 | 211,266 |

Plaintiff is a corporation that operates as a general contractor for construction projects. Plaintiff qualifies as a small business. When organized in 1973, plaintiff had approximately six employees; in 1987 and 1988, plaintiff had approximately 35 employees. Plaintiff's main office is in San Diego, California, which is the location of its president. Supervision of the administration of contracts relative to plaintiff's various projects is performed at the San Diego office. As needed, plaintiff established field offices for supervisors at project locations.

Plaintiff appointed a project manager for the Libby Army Airfield reconstruction contract on September 24, 1987, and notice of the appointment was given to the Army on that date. The project manager's responsibilities included providing coordination of project foremen, subcontractors, and suppliers, preparation of the Daily Report to Inspector, notification of the CO of any problems, implementation of the Quality Control Plan, and enforcement of the Safety Program. The project manager had a field office in Tucson, and an office in a trailer on-site at Fort Huachuca. All of plaintiff's activities relative to the subject contract were performed by two employees: plaintiff's president, located in San Diego, and the project manager, located at the field offices.

As a general contractor, most of the work on contracts secured by plaintiff was provided through subcontractors. This contract contained nine line items, three of which concerned grading and removal of asphalt concrete (Item 4), aggregate base and asphalt concrete materials (Item 5), and installation of aggregate base and as-

phalt concrete (Item 6). Another major line item (No. 8) concerned replacing and testing runway lighting.

The subcontractor for the asphalt work was Granite Construction Co. (Granite). The estimated value of the asphalt work totaled $730,456, which was 72.8 percent of the total $1,005,000 contract price. The subcontractor for the runway lighting work was ESS Corporation. The estimated cost of the lighting work was $148,000, which represented 14.7 percent of the total contract price. Together, the Granite and the ESS Corporation subcontracts covered 87.5 percent of the total contract value.

Granite does business nationwide; its business amounts to approximately $600 million annually, with $50 to $70 million at its Tucson office. The Fort Huachuca project amounted to approximately 1.4 percent of Granite's work at the Tucson office.

The major portion of plaintiff's claims are founded on claims from its subcontractor, Granite. Plaintiff's February 13, 1989, request to the CO for a change order was based on a claim from Granite to plaintiff on January 25, 1989. Plaintiff's amended complaint, filed May 7, 1990, incorporated additional information provided by Granite. Plaintiff's delay claims presented at trial and in posttrial briefing present contractor costs that amounted to approximately 14 percent of the total; the balance of the delay claims (approximately 86 percent) originate in the subcontractor, Granite.

Granite's first claim was submitted to plaintiff on January 25, 1989. In this claim, Granite sought time extensions of 91 days: (1) 41 days during the period September 17 through October 27, 1987, for failure to issue timely the NTP; (2) 15 days during the period October 27 through November 11, 1987, for unavailability of the work site; and (3) 35 days for the period during January 19 through February 23, 1988, for additional testing of asphalt-in-place. Delay costs for items 1 and 2 were claimed at $448 per day, a total of $25,-110.40. Delay cost for item 3 was $247.60 per day, a total of $8,666. The total dollar value of Granite's first claim was $33,-776.40.

After the complaint was filed, the Fort Huachuca office on November 9, 1990, requested the Defense Contract Audit Agency to audit plaintiff's February 13, 1989, request to the CO for a change order, which included Granite's January 31, 1989, delay claim for $33,776. Before the audit was completed, plaintiff's contract consultant put together a revised delay claim for plaintiff which included: bid preparation costs of $9,750, prime contractor costs of $36,050, and Granite's subcontractor claim of $150,682 (second claim). The total amount claimed was $196,482. The delay periods applicable to Granite's second claim, were: (1) Sept. 17–Oct. 27, 1987 (41 days); (2) Oct. 28–Nov. 11, 1987 (11 days), and Jan. 19–Feb. 22, 1988 (34 days), a total of 89 days.

The audit of contractor costs claimed in plaintiff's February 13, 1989, request to the CO was reported on February 7, 1991. The report did not include an evaluation of the Granite subcontractor claim of $33,776 because an assist audit had been requested for the subcontractor revised claim, which had not been received but which was described as having been increased to approximately $198,000. The February 7, 1991, audit report questioned $3,226 of the $10,-399 that had been claimed for labor of the project manager during the three delay periods, and questioned all of the $7,156 that had been claimed for contractor profit in those periods. FAR 52.212–12 excludes profit from an equitable adjustment of a delay claim.

The audit of Granite's second claim was reported on March 6, 1991. The report questioned $138,066 of the $150,682 claimed by Granite. The report included the following:

> Granite received approximately $761,000 from Commercial Construction for performance of this contract. The job cost ledgers show it cost Granite $612,003, plus $42,840 Home Office Expense (approximate at seven percent), leaving a profit of $106,157. Therefore, Granite did not sustain a loss on this contract due to delays.

The preconstruction conference was held on September 10, 1987. Plaintiff was represented by its president and project manager. Representatives of Granite and ESS Corp. also attended. A check list was distributed at the conference which listed an Item 8—Progress Schedules. Check list Item 8 authorized bar charts or CPM (critical path method), and subsequent revisions, for the progress schedule requirement. The applicable contract provision was identified as CC–57. The contract documents included a Corps Index of Contract Clauses for construction inside the United States, which at No. 57 referenced FAR 52.236–15. Item 8 recited that a preliminary schedule is due within 10 days of the NTP; a complete schedule is due within 40 days of the NTP.

FAR 52.236–15 (48 C.F.R. § 52.236–15) provides the contractor shall prepare and submit to the CO for approval a practicable schedule showing the order in which the contractor proposes to perform the work, and the dates on which the contractor contemplates starting and completing the several salient features of the work (including acquiring materials, plant, and equipment). The schedule shall be in the form of a progress chart of suitable scale to indicate appropriately the percentage of work scheduled for completion by any given date during the period. Actual progress on the chart is to be entered as directed by the CO, and an annotated schedule is to be delivered to the CO. If the contractor falls behind the approved schedule, the contractor shall take steps necessary to improve its progress, including those that may be required by the CO, without additional cost to the Government.

Plaintiff did not provide, and the record does not contain, schedules or progress charts that show the status of completed work, or schedules which would show impact of delays claimed by plaintiff and its subcontractors. In discovery, defendant sought information about work schedules and updates or revisions to work schedules that were related to the claimed delays. Plaintiff's response was that "Commercial has no work schedules, updates, or revi-

sions to work schedules in its files." At trial, plaintiff did not produce any documentation that would show compliance with FAR 52.236–15.

The record contains two construction progress charts that show by bar graphs estimated schedules for contract line items but do not show actual progress of the work for those items. Both progress schedules were signed by the project manager. The first, dated September 25, 1987, was prepared prior to issuance of the NTP. It shows the AC removal and grading (Item 4) was scheduled to begin November 1, 1987, and to be completed by December 31, 1987. Items 5 and 6, procurement of base and asphalt concrete materials and their installation, were shown as scheduled to begin on January 1, 1988, and to be completed by the last day of February 1988.

The second chart was dated October 29, 1987. It shows the NTP as October 27, 1987, the date of the bonds as September 17, 1987, and a contract completion date of April 24, 1988. Work on AC removal and grading was shown as scheduled to begin on November 1, 1987, and to be completed by December 31, 1987. Work on purchase and installation of the aggregate base and asphalt concrete was shown as scheduled to begin January 1, 1988, and to be 100 percent complete by the last day of February 1988. Plaintiff's second schedule was not satisfactory to the CO, and plaintiff was so notified on November 7, 1987. It was not satisfactory because it was not sufficiently detailed to identify activity breakdown, such as "activity completion to date, delays and how they impact critical items of work, what work is being done, where and when, etc."

Notwithstanding the superficial content of the progress schedules that are in the record, the bar charts do show that plaintiff intended to mobilize in October and November 1987, and to do the asphalt concrete work in January and February 1988. At trial, there was no testimony that plaintiff failed to meet the milestones set forth in the progress schedules. A construction status report prepared by the Corps' contract representative, dated February 8,

1988, shows a scheduled completion percentage as of February 1, 1988, at 76 percent, and actual completion on that date at 64 percent. The Corps' contract representative estimated that, by March 1, 1988, completion would reach 93 percent.

■ In posttrial briefing, plaintiff argues that the entire project could have been completed in 60 working days, which equates to approximately 84 calendar days, and that, accordingly, all of the work could have been completed on or before December 30, 1987. On this basis, plaintiff says defendant would be liable for 195 days delay (Dec. 30, 1987, to July 13, 1988). Plaintiff's argument is novel and fanciful. There is no reliable evidence that plaintiff or Granite ever intended to complete the project before the contract completion date. Both of the progress schedules in evidence show plaintiff intended to use the entire contract performance period to complete the work.

Plaintiff cites *Weaver–Bailey Contractors, Inc. v. United States*, 19 Cl.Ct. 474 (1990) to support its argument that the progress charts are not relevant to the early completion issue. In *Weaver–Bailey*, the court noted that progress charts, in general, are used for other purposes, such as a basis for progress payments, and do not necessarily reflect a contractor's intended early completion. The court explained that a contractor cannot lose when it projects that it will use all the time allowed, but it can be hurt when it projects early completion. *Id.* at 479. *Weaver–Bailey*, however, is not factually comparable to this case. There, the contractor's performance schedule was disrupted drastically by a substantial error by the Government as to the volume of excavation work. Because of defendant's underestimate, the contractor was forced to delay finishing work while it concentrated on completing extra earth work. Further, a credible witness demonstrated that the contractor intended to and would have completed early but for defendant's error. There is no credible evidence in this case that the work, in any event, would have been completed on or before December 30, 1987.

Plaintiff's three delay claims are founded on Contract Clause 8, Suspension of Work, FAR 52.212–12 (48 C.F.R. § 52.212–12). The clause makes an adjustment unavailable to the extent that other causes attributed to the contractor would have simultaneously suspended, delayed, or interrupted contract performance.

The Suspension of Work clause states in part:

> (b) If the performance of all or any part of the work is, for an unreasonable period of time, suspended, delayed, or interrupted (1) by an act of the Contracting Officer in the administration of this contract, or (2) by the Contracting Officer's failure to act within the time specified in this contract (or within a reasonable time if not specified), an adjustment shall be made for any increase in the cost of performance of this contract (excluding profit) necessarily caused by the unreasonable suspension, delay, or interruption, and the contact modified in writing accordingly. However, no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor....

■ The content of the Suspension of Work clause has been delineated in precedent, binding on this court, of the Court of Claims and the Federal Circuit. A primary objective of the Suspension of Work clause is to provide a contractual basis for compensating a contractor for government-caused delays of an unreasonable duration. *Chaney & James Constr. Co. v. United States*, 190 Ct.Cl. 699, 421 F.2d 728 (1970). In order to recover under the Suspension of Work clause, a contractor must show that (1) contract performance was delayed; (2) the government directly caused the delay; (3) the delay was for an unreasonable period of time; and (4) the delay injured the contractor in the form of additional expense or loss. *John A. Johnson & Sons, Inc. v. United States*, 180 Ct.Cl. 969, 986, 1967 WL 8810 (1967); *River Constr. Corp. v. United States*, 159 Ct.Cl. 254, 270, 1962

WL 9302 (1962). The burden of proof is upon the contractor to establish that defendant did in fact cause delay, and further that any delay adversely affected the project, entitling the plaintiff to an equitable adjustment. *See William F. Klingensmith, Inc. v. United States*, 731 F.2d 805 (Fed.Cir.1984); *Blinderman Constr. Co. v. United States*, 695 F.2d 552 (Fed.Cir.1982); *DeMatteo Constr. Co. v. United States*, 220 Ct.Cl. 579, 600 F.2d 1384 (1979). Constructive suspension results, even when a CO fails to issue a stop work order, when a contractor is effectively suspended or delayed. *Merritt–Chapman & Scott Corp. v. United States*, 192 Ct.Cl. 848, 429 F.2d 431, 443 (1970). The clause does not define what is a reasonable or unreasonable period of delay. *DeMatteo Constr. Co.*, 600 F.2d at 1390. Whether a particular delay is reasonable or not depends upon the circumstances of the particular case. *Tri-Cor, Inc. v. United States*, 198 Ct.Cl. 187, 458 F.2d 112 (1972). If a contractor can prove that a suspension delayed the performance of any part of the work for an unreasonable time, and increased costs, then a contractor can recover under the Suspension of Work clause. *Chaney & James Constr.*, 421 F.2d at 736.

Defendant argues that in order to prove injury from a delay, the contractor must provide a detailed schedule, or critical path analysis, indicating which activities were delayed. Only "[a] delay ... of work along the critical path will affect the entire project." *Haney v. United States*, 230 Ct.Cl. 148, 676 F.2d 584, 595 (1982). This court has held that plaintiff must "by a preponderance of the evidence: (1) quantify the number of delay days attributable to the defendant, and (2) provide proof that said delay days were in fact on the critical path[,]" in order to prove that a delay caused damages. *Youngdale & Sons Constr. Co. v. United States*, 27 Fed.Cl. 516, 550 (1993).

Plaintiff argues that a critical path analysis is not necessary to prove damage from delays. Plaintiff points out that during some periods, no daily reports were submitted, *i.e.*, daily report No. 052 is for January 19, 1988; daily report No. 053 is for March 23, 1988. These consecutive reports covered a period of 63 days. Plaintiff asserts that with a pure suspension, with no work going on, it does not take a critical path to demonstrate that both critical and non-critical items were delayed.

██ A critical path analysis would be helpful to determine the effect of delays on the construction project. The preconstruction conference check list, however, indicates that bar charts or the critical path method, with revisions, could be utilized for progress schedules. Although an actual critical path analysis may not be necessary, plaintiff does have to provide some evidence of injury from the delays. In order to hold defendant liable for delays, plaintiff must supply specific proof that plaintiff's performance was affected by the Government's undue delays. *See Commerce Int'l Co. v. United States*, 167 Ct.Cl. 529, 338 F.2d 81, 89 (1964). The mere allegation that delays caused work to be disrupted or performed out of sequence, or caused costs to be increased, will not satisfy plaintiff's burden of proof.

**Delay No. 1—Late Issuance of NTP**

Plaintiff seeks damages for 36 days of delay from September 27, 1987, the date plaintiff allegedly planned to commence construction, to November 2, 1987, the date plaintiff acknowledged receipt of the NTP.

Plaintiff claims that at the September 10, 1987, preconstruction conference, a Corps engineer stated that the Army would issue the NTP within 10 days of receiving plaintiff's payment and performance bonds. At trial, the named individual testified and denied that he had so represented at the preconstruction conference, or at any time thereafter, that the NTP would be issued within ten days of receipt of the bonds. Plaintiff points to several exhibits to support its claim. These exhibits, however, are letters dated November 6, 1987, January 25, 1989, and February 13, 1989, written by plaintiff's president, or its project manager or by Granite, which merely recite plaintiff's version of the alleged statements made at the preconstruction conference. A

memorandum to the CO on plaintiff's claim, written by the Corps resident engineer, states: "What the Government actually told the Contractor was NTP could be issued as *early* as 10 calendar days after receipt of acceptable Contractor Payment and Performance bonds."

Plaintiff has the burden of proving its case by a preponderance of the evidence. Plaintiff has not submitted any reliable evidence that supports the statement allegedly made at the preconstruction conference concerning the issuance of the NTP. The evidence consists solely of plaintiff's and defendant's contrary recollections of what the Corps engineer said at the meeting. In fact, the Corps engineer was not the CO and did not have the authority to state a date for issuance of the NTP. The Corps engineer who spoke at the preconstruction conference testified for defendant at trial. His testimony was credible. There is an absence of any clear evidence that he made the alleged statement. Accordingly, the court does not agree that he made the statement as asserted by plaintiff.

 Any delay in the Army's issuance of the NTP does not, in and of itself, amount to compensable delay. *Appeal of Essential Constr. Co. & Himount Constructors Ltd.,* 89–2 B.C.A. (CCH) ¶ 21,632, at 108,834, 1989 WL 15515 (1989) ("It is immaterial that some particular event came along which disrupted certain work or delayed its start or completion.... [I]t is [the contractor's] burden to convince us of the impact on the overall completion of the project."). The Army's issuance of the NTP on October 26, 1987, did not, in and of itself, compensably delay plaintiff.

 The contract does not contain a provision establishing when the NTP should be issued. Defendant, however, has a clearly implied obligation to give such notice within a reasonable time after the performance and payment bonds are furnished. *Ross Eng'g Co. v. United States,* 92 Ct.Cl. 253, 258, 1940 WL 4077 (1940). "But reasonableness is, in each instance, a question of fact." *Parish v. United States,* 120 Ct.Cl. 100, 98 F.Supp. 347, 349 (1951) *cert. denied,* 342 U.S. 953, 72 S.Ct.

625, 96 L.Ed. 708 (1952); *see Appeals of Marine Constr. & Dredging, Inc.,* 90–1 B.C.A. (CCH) ¶ 22,573, at 113,283, 1989 WL 161145 (1989) (The reasonableness of the passage of time between contract award and NTP issuance is not a matter of law, but rather a question of fact.).

 Plaintiff implies that the 36 day period from September 27, 1987, the date the contractor expected to receive the NTP, until November 2, 1987, the date of actual receipt by the contractor, was unreasonable. Plaintiff also states it submitted acceptable performance and payment bonds on September 17, 1987, and the Army issued the NTP 40 days later on October 26, 1987. Plaintiff asserts that 12 days was a reasonable time within which to issue an NTP, and cites *Ross Eng'g Co.,* 92 Ct.Cl. at 258–59. *See Appeal of Goudreau Corp.,* 88–1 B.C.A. (CCH) ¶ 20,479, at 103,595, 1988 WL 44352 (1988) (A 3–month delay between the furnishing of performance and payment bonds and the issuance of the NTP was unreasonable.).

Defendant testified that 20 days would be a typical period of time for processing the bonds. The CO's final decision states that issuance of the NTP 30 days after receipt of acceptable bonds is reasonable. In some circumstances, a delay greater than 30 days may be permitted. *See Appeal of DeMatteo Constr. Co.,* 76–2 B.C.A. (CCH) ¶ 12,172, 1976 WL 2508 (1976) *aff'd,* 220 Ct.Cl. 579, 600 F.2d 1384 (1979).

The record is not clear as to the time defendant actually received the payment and performance bonds. The September 26, 1989, memorandum to the CO by the Corps resident engineer states that the bonds were submitted on September 17, 1987. There apparently is no record of the actual date of receipt. On the assumption that it would take 4 days for the Contracting Division to receive the bonds after they were sent, the memorandum concludes that the Army received the bonds on or about September 21, 1987. The CO decision on November 21, 1989, states that the bonds were submitted initially on September 7, 1987, and, for some reason, were returned

to plaintiff on or about September 17, 1987. The CO then estimated that, after a 10–day turnaround, defendant received the bonds on September 27, 1987.

A 40–day delay in issuance of the NTP, in these circumstances, is not unreasonable. If the bonds were delivered on September 27, 1987, a 30–day processing period would not be unreasonable.

 Plaintiff has presented no evidence demonstrating that defendant unreasonably delayed the processing of the bonds. Even if defendant did unreasonably delay the issuance of the NTP, there still must be proof that the delay injured plaintiff. "[N]o matter · how unreasonable the Government's delay, there can be no recovery without proof that the delay caused material damage." *Commerce Int'l Co.*, 338 F.2d at 89.

 Plaintiff's proposed schedule correctly predicted that construction would commence in early November 1987. Plaintiff has failed to produce any detailed information indicating how alleged delays affected its performance of the project. Defendant argues that a progress schedule alone will not satisfy plaintiff's burden of proving injury from delay. An adequate performance analysis does not exist unless details regarding the interdependence of project activities is available.

 Although a critical path analysis may not be required in order to obtain relief, plaintiff must present evidence on how alleged delay impacted the project or increased expenses. Plaintiff's bare allegations that a suspension had an impact which injured plaintiff is not sufficient to meet its burden of proof. Plaintiff has not presented any evidence that the delay of the NTP caused any damage. The progress schedule in evidence indicates that construction was to begin in early November, which it did. Plaintiff has not shown that it has been damaged by reason of the issuance of the NTP. Accordingly, plaintiff is not entitled to compensation on Delay Claim No. 1.

**Delay No. 2—Unavailability of Work Site**

Plaintiff seeks damages for 8 days from November 3, 1987, to November 10, 1987, because contract work could not be commenced after the NTP was received on November 2, 1987, due to the necessity to correct defendant's oversights in designing the project. The contract documents did not provide (1) for runway closure markings, a safety requirement, (2) a required electrical disconnect to inactivate two runways on which work was to be done, and (3) temporary access provisions to the Airport from Taxiway No. 7. Work to correct the design oversights was accomplished, and plaintiff commenced actual contract construction on November 11, 1987.

Plaintiff gave notice on November 2, 1987, of potential construction delays, and on November 6, 1987, the CO's representative requested a proposal for the additional work. An inscope supplemental agreement, No. P00002 (Mod 2) was negotiated to cover these changes. Mod 2, signed by the CO on February 16, 1988, and by plaintiff's president on February 23, 1988, provided for a price increase of $3,910; the time for performance remained unchanged. Mod 2 contained the following provision:

> It is further understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all costs and markup directly or indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated.

At trial and in posttrial briefing, defendant reiterated its contention that Mod 2 is barred by accord and satisfaction. This issue was examined previously on defendant's motion for summary judgment, and it was found that an issue of fact existed as to the subject matter, content, and scope of the negotiations between the parties. Information to address this problem was provided at trial. The CO's November 6, 1987, request for proposals is in evidence. Additionally, the court requested and received Corps procedural manuals which

provide guidance for negotiations regarding impact and delay to unchanged work.

The Office of the Chief of Engineers provides a pamphlet captioned: Modifications and Claim Guide for fixed price construction contracts. This pamphlet on the subject of requirements for negotiations states:

Detailed guidance for negotiations is beyond the scope of this pamphlet. However, the 'Construction Contract Negotiation Guide' used as a text for the OCE Construction Contract Negotiating Course provides guidance regarding negotiations.

Chapter 12 of the Construction Contract Negotiation Guide specifically addresses negotiation procedures required for negotiations relative to impacts. The Guide provides:

Under our present 'Changes' and 'Differing Site Conditions' clauses, an equitable adjustment clearly encompasses the effect of a change order upon any part of the work, including delay expenses, provided that such delay was necessary, reasonable, and a foreseeable result of the change. The "impact" of a change must be considered, computed, and negotiated. Assuming that a change was ordered which causes an extension of the performance time for the contract, consideration of the equitable adjustment must include numerous types of costs such as the following:

(i) Additional cost for the performance of unchanged work because of extended performance time caused by the change and the effects on extended supervision, overhead, and bonding.

Subsections (ii) through (vii) identify such items as wage rates on unchanged work, storage costs for unchanged work, protection of materials for unchanged work, etc.

The Price Negotiation Memorandum of the Corps Los Angeles District Southern California Area Office requires the negotiator to include a Price Negotiation Memorandum (PNM, also called the resume of negotiations) in the contract record for change orders. The Memorandum includes the following:

c. The *key ingredient* of the PNM is to show, by the documents referred to in the PNM, that the Government negotiated a fair and reasonable price. This is what the auditors who review our modifications look for. Therefore we cannot simply state that we reviewed the contractor's proposal and it looked reasonable without for example comparing cost elements against some sources for evaluation.

\* \* \* \* \* \*

The PNM should include narrative highlights of discussions, agreements, additions, deletions, etc. Mark up the contractor's proposal to reflect actual agreements reached. In general discuss all changed items on the proposal.

d. Impacts (on both the direct and indirect work) and extended overhead costs are critical items and should be discussed during every negotiation and included in the PNM.

Mod 2 was negotiated by plaintiff's project manager and the Chief of the Construction Support Branch at Fort Huachuca at that time. Plaintiff's president did not attend the negotiations. At trial, defendant's witnesses testified that the negotiation procedures were followed, that the negotiations addressed both direct and indirect costs to changed work, as well as costs resulting from impacts to unchanged work, and asserted that in the absence of evidence showing that the negotiation procedures were not followed, the presumption of regularity establishes that the procedures were followed.

Negotiations for Mod 2, were held November 9, 1987. The resume of negotiations notes that plaintiff had submitted a proposal dated November 2, 1987, relative to runway safety markings that did not request a time extension, and that the other work was covered by a verbal proposal during negotiations, with no time extension requested. The resume of negotiations recites the parties agreed that the legal completion date was not affected by the addi-

tional work. Defendant argues that because plaintiff did not request an extension for the legal completion date, it did not suffer delays to the unchanged work.

■ Although the negotiation manual requires a reference to impact or direct costs in the resume of negotiations, defendant's negotiator did not include it in Mod 2's resume of negotiations. He testified, however, that the resume of negotiations mentioned impacts to unchanged work by stating that the legal completion date remained intact, and that a delay would be a type of impact. The fact that the legal completion date remained intact does not prove that plaintiff was not injured by an alleged delay. *Chaney & James Constr. Co.*, 421 F.2d at 736.

■ The resume of negotiations does not include a discussion of impacts on direct and indirect work. The Corps negotiator did not comply with the procedures. Plaintiff has shown that the scope and content of negotiations did not include a discussion of impact on unchanged work. Accordingly, plaintiff's claim is not barred by the doctrine of accord and satisfaction.

The conclusion that Mod 2 did not constitute an accord and satisfaction, however, does not resolve plaintiff's claim for delay damages based on unavailability of the work site. The cause for any work site unavailability was a design oversight. The Army specification did not include the required safety markings. In addition, the electrical disconnection was not completed by Fort Huachuca Electrical Service due to shortage of material.

" '[A]n implied provision of every contract ... [is] that neither party to the contract will do anything to prevent performance thereof by the other party or that will hinder or delay him in its performance.' " *Dale Constr. Co. v. United States*, 168 Ct.Cl. 692, 700, 1964 WL 8611 (1964) (quoting *George A. Fuller Co. v. United States*, 108 Ct.Cl. 70, 69 F.Supp. 409, 411 (1947)).

■ While defendant may have made the work site unavailable for 8 days, plaintiff has presented no evidence on whether

the delay was unreasonable or whether the delay caused it injury. Plaintiff argues that because of the extra work required by Mod 2, the site was unavailable and work could not proceed, but not that the work required additional time for the contract to be completed. Plaintiff admits that the project manager's pickup truck did not remain idle during the delay periods. The truck "was used to do the preparation work that was necessary to do the project." It is clear that plaintiff continued work on the project at that time.

In the absence of a schedule or other evidence indicating that plaintiff incurred additional expenses over those already paid by the Corps, plaintiff has not proven that it has endured a compensable delay. Plaintiff has been paid for 44 days in liquidated damages that had been assessed. The liquidated damages days are equivalent to the periods claimed in delay No. 1 and delay No. 2. Plaintiff should and did receive payment in Mod 2 for the work necessitated by the Corps' oversight. Plaintiff, however, did not present any evidence on how this extra work impacted the remainder of the project. Plaintiff has failed to meet its burden of proof, and accordingly relief for alleged delay No. 2 must be denied.

**Delay No. 3—Additional Testing of Asphalt-in-Place**

Plaintiff seeks damages for 63 days delay from January 19, 1988, to March 23, 1988, based on additional testing of asphalt concrete that had been placed during December 1987, and the requirement for a new asphalt concrete mix design. Both actions allegedly were contrary to contract obligations and specifications.

The contract documents incorporate FAR 52.246–12 (48 C.F.R. § 52.246–12) which requires a contractor to maintain an adequate inspection system and to perform such inspections as will insure the work conforms to contract requirements. FAR 52.246–12(b). FAR 52.246–12(f) states in part:

(f) The Contractor shall, without charge, replace or correct work found by the Government not to conform to contract requirements, unless in the public

interest the Government consents to accept the work with an appropriate adjustment in contract price.

The contract technical specifications provide that initial testing for acceptability of work would be performed by the Government and that additional tests required to determine acceptability of nonconforming material will be performed by the Government at the expense of the contractor. Technical Provision 2C—9.1. "When a lot of material [a lot equals 1,000 tons] fails to meet the specification requirements, that lot shall be removed and replaced or accepted at a reduced price." Technical Provision 2C—9.1.2.

After plaintiff began construction work on November 11, 1987, both parties inspected and tested in-place asphalt concrete for compliance with the specification. Plaintiff hired Western Technologies, Inc. (WTI) to do its inspections; defendant's testing service was Spaulding Engineering/Cochise Laboratories, Inc. (Cochise). WTI concluded that the asphalt concrete placed on the runway surfaces failed to meet the requirements of Technical Provision 2C of the contract, for asphalt content, percent voids, aggregate gradation, and thickness. Cochise concurred with WTI's conclusions, although it reached different testing results.

Because WTI's and Cochise's testing results differed significantly, the parties agreed on December 29, 1987, that two additional laboratories (one commercial and one Government) would be employed to test the in-place material to determine contract compliance. These laboratories were Granite and the Corps of Engineers/Sausalito Laboratory (Sausalito).

The December 29, 1987, meeting was called by the CO's representative because he wanted to ascertain whether the discrepancies in asphalt concrete test results were due to lab quality or asphalt quality. The meeting was attended by plaintiff's project manager, two representatives of the Corps, and six representatives from Granite. Defendant contends the parties mutually agreed to retest the in-place asphalt concrete. Plaintiff asserts that it was given two choices: shut down all operations and

test the asphalt, and/or rip up all asphalt then in place. The record supports the conclusion that the CO's representatives did not direct plaintiff to stop work, and plaintiff did not receive a stop work order from the Army with respect to the retesting program.

In the alleged testing delay, defendant acted in accordance with the contract provisions. The contract provisions cited above put plaintiff on notice that additional testing may be necessary, and that when a lot failed, it could be replaced or accepted at a reduced price. Any additional tests that were needed were to be at the expense of the contractor. When the bituminous mixture falls below the specifications, the paving operation "shall be stopped until the cause of noncompliance is determined and corrected." Technical Provision 2C—13.2.

Plaintiff relies on FAR 52.246–12(h) to support its contention that the Government owes plaintiff damages for the testing of asphalt. The regulation provides in part:

(h) If, before acceptance of the entire work, the Government decides to examine already completed work by removing and/or tearing it out, the Contractor, on request, shall promptly furnish all necessary facilities, labor, and material. If the work is found to be defective or nonconforming in any material respect due to the fault of the Contractor or its subcontractors, the Contractor shall defray the expenses of the examination and of satisfactory reconstruction. However, if the work is found to meet contract requirements, the Contracting Officer shall make an equitable adjustment for the additional services involved in the examination and reconstruction, including if completion of the work was thereby delayed, an extension of time.

Plaintiff is in error for two reasons. First, plaintiff argues that, because the Government accepted the asphalt at a lower price, it owes plaintiff an equitable adjustment. Plaintiff's asphalt concrete, however, did not meet the requirements of the specification. The test results dated prior to December 29, 1987, showed the in-

place asphalt concrete consistently was in the reject range of the specifications. The asphalt concrete clearly was nonconforming. Because of that failure, plaintiff must bear the expense of the additional testing. Plaintiff was merely following contract requirements when it decided to perform the additional testing on in-place asphalt. Second, since the asphalt concrete was neither removed nor torn out, FAR 52.246–12(h) does not apply.

At the December 29, 1987, meeting the parties reached a mutual agreement to retest the in-place asphalt. Plaintiff decided to cease placement until after additional test results were received. The Army provided plaintiff with an informal copy of the Sausalito results on February 3, 1988. Plaintiff incorporated these test results in a February 7, 1988, letter to Sierra Ready Mix, the company which prepared the asphalt mix design. On February 12, 1988, the Army sent plaintiff the official results of the Government laboratory tests, and told plaintiff of the need for revisions in the design mix. On March 8, 1988, the Army provided plaintiff with the results of an independent study, which suggested that the Army pursuant to Technical Provision 2C—9.1.2, accept the in-place asphalt in return for a price reduction to the contract. On March 9, 1988, plaintiff submitted Eng. Form 4025, to secure a variance for the mix design. The new mix design was approved on March 18, 1988.

■ The parties negotiated a credit to the contract price in return for the Government's acceptance of the in-place asphalt. Contract Amendment P00006 (Mod 6) was signed by the Government on August 5, 1988, and by plaintiff's president on August 16, 1988. Mod 6, in accordance with Technical Provision 2C—9.1.2, reduced the contract price by a percent of the total cost of in-place asphalt concrete material, which was found to be acceptable, but out of contract specifications. The change in contract price was a decrease of $8,723; there was no change in contract time. Mod 6 contained the following provision:

It is understood and agreed that this adjustment constitutes compensation in full on behalf of the contractor and its subcontractors and suppliers for all costs and markup directly or indirectly attributable to the change ordered, for all delays related thereto, and for performance of the change within the time frame stated.

At trial, and in posttrial briefing, defendant reiterated its contention that Mod 6 is barred by accord and satisfaction. This issue was examined previously on defendant's motion for summary judgment, and it was found that material issues of fact existed because the record did not include information on the scope and content of the negotiations prior to execution of Mod 6. Information to address these matters was presented at trial. This additional information was adequate to show a mutual agreement for settlement of a bona fide dispute and the elements that are essential to an accord and satisfaction. *See Commercial Contractors, Inc.*, 25 Cl.Ct. at 669.

Mod 6 was negotiated by plaintiff's project manager and an authorized representative of the CO. The negotiations were held on July 13, 1988. Prior to the negotiations, the CO's representative on June 7, 1988, had requested a cost proposal on the program involved in the reports of the four testing laboratories and the independent study on the acceptability of the in-place asphalt concrete. The request included the following paragraph:

Your proposal containing a complete itemized breakdown must be submitted in sufficient detail to permit an analysis of all material, labor, equipment, subcontract, and overhead costs, as well as profit, and shall cover all work involved in the modification, whether such work is deleted, added or changed, and shall also include the effects of the changes on unchanged work (impact) if any. Please separate credit and debit items, including their applicable markups. It is requested that this be submitted to this office no later than June 21, 1988.

Plaintiff's response, dated July 5, 1988, incorporated information which had been obtained from Granite on July 1, 1988. The response addressed only the amount of

the price reduction penalty for the in-place asphalt concrete. No response was made to the request for information on impacts on unchanged work. In the negotiations for Mod 6, plaintiff never indicated that its response to the request for proposal was incomplete.

At trial, defendant's negotiator for Mod 6 testified that he was familiar with the requirements of the Corps Modification and Claims Guide and the Construction Contract Negotiation Guide. He testified that he followed these procedures in his negotiations, including the instructions in the PNM to negotiate changes to unchanged work.

The test results of the in-place asphalt concrete were available at the negotiations for Mod 6 as an attachment to Granite's July 1, 1988, letter. During the negotiation, defendant's negotiator testified, that he had discussed with plaintiff's project manager all costs, including impact, extended field overhead, and related G & A home office costs. The resume of negotiations for Mod. 6 states "it was agreed during the negotiations that the legal completion date would not be affected by this change." Defendant's negotiator testified this statement reflected discussions regarding delay and impact to plaintiff for changed and unchanged work. The resume of negotiations contains the following:

> It was determined that the negotiated net decrease in the amount of <$8,723.00> including overhead, profit and verified bond premium, was considered acceptable. The negotiated amount includes adjustment in price for all costs including impact, extended field overhead and related G & A home office overhead costs.

In the negotiations for Mod 6, and in the record made by the Corps, there was compliance with required procedures applicable to the generation of the general release that is recited in the modification. The testimony of plaintiff's president that his project manager was not authorized to negotiate a settlement, and that the president's signature on Mod 6 did not represent his acceptance of the settlement, is not persuasive. At trial, there was no testimony that refuted the statements in the resume of negotiations. Thus, an accord and satisfaction existed with regard to delay No. 3 that now bars this claim.

## CONCLUSION

Plaintiff has failed to meet its burden of proof for compensable delays under the Suspension of Work clause. Plaintiff has not produced evidence which demonstrates that the alleged delay No. 1 of 36 days and delay No. 2 of 8 days impacted other work in the project. Plaintiff did not endure unreasonable delays during these two delay periods. Defendant has shown that plaintiff's claim as to delay No. 3 was resolved through an accord and satisfaction.

Accordingly, the Clerk is directed to dismiss the complaint. No costs.