ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| Matcon Diamond, Inc. | ) | ASBCA No. 59637 |
| | ) | |
| Under Contract No. W912KC-12-C-0002 | ) | |

APPEARANCE FOR THE APPELLANT:     David A. Levine, Esq.
                                  Blumling & Gusky, LLP
                                  Pittsburgh, PA

APPEARANCES FOR THE GOVERNMENT:   Scott N. Flesch, Esq.
                                  Army Chief Trial Attorney
                                  Harry M. Parent, III, Esq.
                                  LTC Joseph J. Jankunis, JA
                                  Trial Attorneys

OPINION BY ADMINISTRATIVE JUDGE STINSON

Appellant, Matcon Diamond, Inc. (Matcon or MDI), appeals a contracting officer's final decision dated July 30, 2014, denying appellant's April 29, 2014, certified claim in the amount of $360,742.92 for extended home office overhead costs based upon a modified Eichleay formula. Our previous decision, dated October 21, 2015, denied the government's motion to dismiss for failure to state a claim upon which relief can be granted. Familiarity with that decision is presumed.

We have jurisdiction pursuant to the Contract Disputes Act of 1978 (CDA), 41 U.S.C. §§ 7101-7109. The parties agreed to submit this appeal for a decision on the record without a hearing pursuant to Board Rule 11. Each party submitted initial and reply briefs as well as affidavits and deposition transcripts to be considered in deciding this appeal. For the reasons stated below, we deny Matcon's appeal.

FINDINGS OF FACT

1. On June 5, 2012, the Pennsylvania Air National Guard 171st Air Refueling Wing (ARW) entered into a fixed price contract, No. W912KC-12-C-0002 (the contract), with Matcon for aircraft apron repair (R4, tabs 1 at 1-2, 2, 4 at 2). The ARW project site, located at the Pittsburgh International Airport, consisted of two aprons, designated East and West, connected to the airport by the East Taxiway and the West Taxiway (R4, tab 4 at 2).

2. Contract work included removal and replacement of concrete slabs, asphalt shoulders, and joint sealant, repair of existing concrete slabs, including cracks in concrete slabs, and removal and painting of airfield lines (R4, tab 1 at 1, 62). The estimated project magnitude was $1M to $5M, with a performance period of "approx. 150 calendar days after receipt of Notice to Proceed" (R4, tab 1 at 1).

3. Matcon was responsible for coordinating with the government the phasing of the contract work. Specifically, the contract provided that "[p]hasing will be negotiated with the successful contractor based on their capabilities and operational constraints" and that "[w]ork shall be accomplished in phases in order to accommodate the airfield operations of the Base" (R4, tab 1 at 8, 63). Paragraph 1.03 of Section 01 31 10 of the contract, entitled "Coordination," provided:

> E. The Prime General Contractor is responsible for the overall coordination of the construction work of the Project and shall coordinate the schedules of all Sub-Contractors on this project to the satisfaction of the Contracting Officer or Contracting Officer's Representative. At the beginning of the Project, within 10 days from Contract Award, the Contractor shall prepare and submit an AF Form 3064 Construction Progress Schedule (bar chart) indicating the phasing [of] all work.

(R4, tab 1 at 71)

4. Paragraph 11.3 of Section 00800 of the contract required:

> [F]or projects exceeding $1M, the contractor shall provide a project plan in the most current version of commercially available software programs to define work tasks and track progress. At least five days prior to work initiation, the contractor shall provide the Contracting Officer a hardcopy CPM and electronic file copy of the plan. . . .

(R4, tab 1 at 32)

5. The contract incorporated by reference FAR 52.243-4, CHANGES (JUN 2007) (R4, tab 1 at 16). Section (f) of that clause provides "[n]o proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract." 48 C.F.R. § 52.243-4(f).

6. DFARS 252.201-7000, CONTRACTING OFFICER'S REPRESENTATIVE (DEC 1991), was incorporated into the contract by reference (R4, tab 1 at 16).

2

DFARS 252.201-7000(b) states, in pertinent part, "[t]he COR is not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract." 48 C.F.R. § 252.201-7000(b).

7. A pre-construction conference was held on June 13, 2012 (R4, tab 85 at 1). The notes for that meeting state that the contracting officer "issued the Notice to Proceed after the meeting" (R4, tab 85 at 16). Prior to that meeting, Matcon prepared and submitted to the government a draft phasing plan (R4, tab 85 at 14). After the meeting, the parties met to develop the phasing plan that Matcon would use to construct its project schedule, ultimately for submission to, and approval by, the government (R4, tabs 59, 85 at 14). The contract required the contractor to start work within ten calendar days after receipt of the notice to proceed (R4, tab 1 at 1).

8. On June 15, 2012, the government provided a slightly revised phasing plan, expanding a portion of the East Ramp Taxiway work for the plan's first phase (R4, tab 60). That same day, Matcon submitted its project schedule to the Government (R4, tab 61). The project schedule proposed performing the work sequentially by phase, moving from phase 1 through phase 4, and contemplated a work completion date of November 9, 2012, 149 days after the notice to proceed (R4, tabs 59, 61 at 2-5).

9. The government approved, without comment, Matcon's proposed schedule and phasing plan on June 21, 2012. In approving the schedule, the contracting officer noted that Matcon was required to submit performance and payment bonds before work could commence and requested that Matcon contact him to discuss mobilization and a work start date. (R4, tab 62) On June 22, 2012, the government moved some work from phase 1 to phase 4 "[d]ue to needing a lay down area for some Bldg 301 structural steel." The government noted that this change "should not be a major impact or conflict with doing the rest of that area 1." (R4, tab 63)

10. According to the Contract Progress Reports, Matcon mobilized for the project during the period from July 1 to July 15, 2012 (R4, tabs 89, 90).

**Differing Site Conditions**

11. After issuance of the notice to proceed, Matcon superintendent John Gyuer and Major Charles Kerns, the contracting officer's technical representative, conducted an initial survey of the project, walking the project site, and identifying additional needed repairs that were not reflected in the contract documents (R4, tab 225 at 7, 177-78). According to Daily Inspection Records dated July 3 and July 5, 2012, the parties discussed differences between planned work as reflected in the contract and conditions at the project site (R4, tab 210 at 5, 7). With respect to one facet of work – partial depth repairs - Matcon suggested that to better insure the completeness of the repair, the

3

minimal size for such concrete repairs be increased from 8" by 8" - as called for in the contract - to 12" by 12" (R4, tabs 23 at 3, 237 at 3-4).

12. The Contract Progress Reports reflect that, from July 1 to July 15, 2012, in addition to mobilization, Matcon performed joint clean and seal, and partial depth patching (repair). Joint clean and seal represented 13.24 percent of the project total, with Matcon completing .55 percent of the 13.24 percent during that period (cumulative percent complete – 4.20 percent). Partial depth patching represented 4.03 percent of the project total, with Matcon completing .05 percent during that period (cumulative percent complete – 1.24 percent). (R4, tabs 89, 90)

13. On July 19, 2012, Major Kerns requested that Matcon provide pricing to increase the "partial repair size to 12" x 12" to provide a better success rate of getting all the repair in one cut instead of dealing with breakouts from surface cracking." Major Kerns requested Matcon provide the revised pricing by COB the following day "to avoid hampering progress." (R4, tab 8)

14. On July 30, 2012, Major Kerns emailed Matcon the approved, revised method for performing the repairs based on the site conditions observed in the field, increasing partial depth repairs to 12" x 12" (R4, tabs 10, 210 at 19).

15. The record contains no written stop work order in July 2012. The contracting officer did not recall issuing any work stoppages during the project and stated that, had he directed the contractor to stop work, he would have done so in writing (R4, tab 228 at 41).

16. Matcon states it could not perform the work from July 17 through July 30, 2012, for a total of 14 days, because of the change in partial repair size from 8" by 8" to 12" by 12" (app. br. at 5 (citing R4, tab 237 at ¶ 28)).

17. The Contract Progress Reports reflect that, from July 16 to July 31, 2012, Matcon continued to perform joint clean and seal, and partial depth patching. With respect to joint clean and seal, Matcon completed an additional 1.71 percent of the 13.24 percent project total (cumulative percent complete 17.10 percent). With respect to partial depth patching, Matcon completed .34 percent of the 4.03 percent project total (cumulative percent complete 9.64 percent). (R4, tabs 91, 92)

18. By email dated July 30, 2012, the contracting officer, Senior Master Sergeant (SMSgt) Anthony Abate, stated:

> We understand that you will incur costs in the phase 1
> work that has been done and planned work [sic]. We still
> need the additional repairs annotated and relayed to the

4

> CORs on a regular basis. You may file a claim for these additional costs if you would like, or wait for the funding to flow to the base and the contract modification to be executed.
>
> In either case, it is imperative that work re-start and continue as planned. With such a tight schedule we cannot afford to lose work days while we finalize the requirements for the additional work needed.

(R4, tab 10)

19. The applicable Daily Inspection Record for the project states that on July 31, 2012, the contractor returned "after 17 July pull-off of job action due to differences of plan and what was contracted" (R4, tab 210 at 19).

20. The Contract Progress Reports reflect that, from August 1 to August 15, 2012, Matcon continued to perform joint clean and seal, and partial depth patching, adding also full depth slab repair. With respect to joint clean and seal, Matcon completed an additional 1.05 percent of the 13.24 percent project total (cumulative percent complete – 25.03 percent). With respect to partial depth patching, Matcon completed an additional .30 percent of the 4.03 percent project total (cumulative percent complete – 17.08 percent). With respect to full depth slab repair, which represented 9.38 percent of the project work, Matcon completed .28 percent (cumulative percent complete – 2.99 percent). (R4, tabs 93, 94)

21. The Contract Progress Reports reflect that, from August 15 to August 31, 2012, Matcon continued to perform partial depth patching and full depth slab repair. With respect to partial depth patching, Matcon completed an additional .09 percent of the 4.03 percent project total (cumulative percent complete 19.31 percent). With respect to full depth slab repair, Matcon completed an additional .05 percent of the 9.38 percent project total (cumulative percent complete 3.52 percent). (R4, tabs 96, 97)

22. By email dated September 18, 2012, SMSgt Abate submitted to Matcon "the quantities of additional and current repairs that need to be expanded that were identified by the Project Engineer/COR" and requested that the contractor submit a change order proposal as follows:

> 1) 1296 each partial depth repairs need to be increased from the original planned size of a partial depth repair from 8" x 8" to 12" x 12".

2) Increase the amount of partial depth repairs for the entire project by 518 (Est.)
3) Increase the amount of 2' x 2' partial depth repairs by 91 (Est.)
4) Increase the amount of partial full depth repairs by 337 (Est.)[1]
5) Add an additional 5 EA full slab replacements.

(R4, tab 20)

23. By email dated September 19, 2012, SMSgt Abate requested that Matcon's prices be "broken down by materials, labor, overhead and general admin, and profit" (R4, tab 20). On September 19, 2012, Matcon submitted its pricing proposal in the amount of $252,098.40, which, according to Matcon, was "simply an extension of bid day pricing for the same work items to accommodate the increased quantities found" (R4, tab 21). Matcon's proposal included an additional factor of 20 percent applied to each item to account for overhead and profit (R4, tab 21 at 2-4).

**Cure Notice**

24. Beginning in September 2012, Matcon experienced difficulty obtaining needed recycled concrete used as aggregate for a portion of the project. By email dated September 19, 2012, Matcon informed the government that "the recycled concrete has impacted our schedule again," that availability was still two weeks away, and, therefore, excavation and asphalt placement would not begin as scheduled. (R4, tab 101) Matcon requested that the parties discuss "different scenarios as far as where to mobilize to next" to ensure "complete vacation of the East ramp for the December inspection" (R4, tab 101 at 2).

25. The government issued a cure notice dated September 19, 2012, regarding the slip in the delivery of crushed stone needed for the Phase I, East Ramp asphalt work, which "has placed the revised schedule for this phase and the overall contract completion date in danger." The government requested that Matcon provide "the planned corrective actions and a firm timeframe when the crushed stone and any other needed materials and/or subcontractor services will be obtained by MDI" The government noted its "intent to work with MDI to the maximum extent possible," and that the "delay is jeopardizing our original intent to complete and vacate this aircraft apron area before our scheduled exercise in December 2012." (R4, tab 100)

---

[1] By email the following day, September 19, 2012, Major Kerns corrected item 4, decreasing the amount of partial full depth repairs from 337 to 118 (R4, tab 20).

6

26. Matcon responded to the cure notice by email dated September 19, 2012, stating that aggregate production would begin October 1, 2012, and excavation and replacement of the subbase would occur October 8, 2012 (R4, tab 101).

27. Progress Meeting notes throughout fall 2012 document Matcon's continued inability to obtain aggregate and commence asphalt placement (R4, tabs 111, 118, 121, 126). Progress Meeting No. 6, dated October 25, 2012, states, "Schedule: MDI plans to submit a revised schedule on or after the 11/08 progress meeting. Awaiting information on aggregate production and asphalt winter schedule." (R4, tab 111 at 2) Progress Meeting notes Nos. 7, 8, and 9, which occurred in November and December 2012, state that Matcon plans to submit its revised schedule on or after the progress meeting on December 19, 2012, and still is awaiting information on aggregate production (R4, tabs 118 at 2, 121 at 2, 126).

28. Matcon submitted a revised contract progress schedule dated December 27, 2012, indicating project completion on June 4, 2013 (R4, tab 131). The record contains no other revised contract progress schedules.

29. Progress Meeting No. 10, dated January 9, 2013, states, in pertinent part:

Schedule: All parties to Discuss the submitted revised schedule [at] today's meeting. Awaiting information on aggregate production and asphalt winter schedule, based on date local asphalt plants will open. Discussed which phase of the asphalt to due [sic] first, but determined to [sic] early to set that schedule.

(R4, tab 135)

30. Progress Meeting No. 11, dated February 14, 2013, states "[s]chedule is tentatively set for MDI to redeploy on March 1st to start asphalt work in Phase 2 of Asphalt area (East-West connector to AGE pad)" (R4, tab 139).

**Contract Modifications**

31. The parties entered bilateral Modification No. P00001, dated September 25, 2012, which, pursuant to section 14 of the modification, was described as a "[c]hange order modification for additional and revised concrete repairs needed due to Differing Site Conditions (FAR 36.502)" (R4, tab 23 at 1). The modification increased the total contract value by $233,348.40, from $1,360,407.00 to $1,593,755.40 (*id.* at 6). The modification accepted the amounts identified in Matcon's pricing proposal dated September 19, 2012, with the exception of the increase in the number of full slab replacements, which was not included as additional work in the modification (R4,

7

tabs 21, 23 at 2-4). Modification No. P00001 also changed the delivery schedule from "150 dys. ADC" (After Date of Contract) to December 31, 2012 (R4, tab 23 at 6). The contractor's pricing in Modification No. P00001 contained a 20 percent markup for overhead and profit (R4, tabs 21, 23).

32. Appellant admits that Modification No. P00001 included a 20 percent line item for overhead and profit, but states "this amount does not include home office overhead" and "instead only overhead related to direct job costs" (app. br. at 7). As support, appellant cites deposition testimony of Daniel Matesic, Matcon's operations manager (R4, tab 226 at 7, 34-35). Appellant presented no evidence to establish specifically what was included in the 20 percent markup. When asked whether Matcon maintained additional documents or spreadsheets that would break down the percentages for overhead and profit, he stated "[n]othing that we would keep. There's rough calculation sheets, such as, you know, scratch paper to determine the proximate quantities required." (R4, tab 226 at 36) He also stated he did not know how much of the 20 percent markup was profit and how much was overhead (*id.* at 39-40).

33. Modification No. P00002, dated January 3, 2013, extended the contract completion date by 158 days, from December 31, 2012, to June 7, 2013 (R4, tab 28).[2]

34. Modification No. P00003 concerned change order work requested by the government (R4, tab 46). In an email to Matcon dated May 7, 2013, SMSgt Abate stated, "[a]long with pricing of the pending change orders for additional drainage work, please include a time extension request if you feel this is needed to complete the project/contract. Please remember to provide the labor, material, OHP [overhead and profit] breakdown." (R4, tab 40 at 2) By email dated May 10, 2013, Matcon stated "we're going to need more time for the west apron work due to its phasing" (R4, tab 40). In a separate email that same day, Matcon submitted change order pricing that included overhead and profit for three of the five change order items (R4, tab 41).

35. On May 16, 2013, the government internally approved the change order in the amount of $120,047.95, "to repair airfield drainage, repair taxilane lights, sawcut additional joints and repair asphalt joint sealant" (R4, tab 42). The accompanying

---

[2] The copy of Modification No. P00002 included in the record is not signed by the contractor (R4, tab 28 at 2), although the email transmitting the modification to Matcon requests a signature from the contractor. Appellant's brief suggests that the modification was bilateral, stating, "[b]ecause the original contract duration was about to expire, the parties executed Modification No. 2 to keep the contract 'open'" (app. br. at 12). Mr. Matesic stated during his deposition that he did not know whether any employee of Matcon signed the modification (R4, tab 226 at 40).

8

Construction Status Report dated May 15, 2013, listed the following reasons and classifications for the change order:

1. Revised airfield markings, unforeseen condition - $39,542.15
2. West Ramp inlet repair, unforeseen condition - $5,750.00
3. North side of ramp drainage installation, unforeseen condition - $55,273.20
4. Taxi light drainage installation, design deficiency - $3,491.88
5. Saw and seal asphalt/concrete joint, design deficiency - $15,990.72

(*Id.* at 3)

36. On May 22, 2013, Matcon requested the contract completion date be extended to July 21, 2013, based upon:

1. Unfavorable weather conditions delayed work starts.
2. Additional Change Orders due to unforeseen conditions lengthened work schedule activities.
3. Required phasing and work restricted areas directed by the Base in order to accommodate their daily operations affected MDI's performance.

(R4, tab 43 at 2)

37. By email dated May 22, 2013, SMSgt Abate informed Matcon the "contract extension request (31-Jul-2013) is approved. I will extend this date as part of the pending contract modification for the multiple change orders (drainage, etc...)." (R4, tab 43 at 1)

38. Bilateral Modification No. P00003, dated July 11, 2013, increased the total contract value by $120,047.95, from $1,593,755.40 to $1,713,803.35 (R4, tab 46). It also extended the contract completion date by 91 days, from June 7 to September 6, 2013 (*id.* at 4-6). The pricing in Modification No. P00003 contained a markup for overhead and profit (R4, tabs 37, 41, 46).[3] The description provided in section 14 of

---

[3] Matcon's price for revised airfield markings ($39,542.15) included a 15 percent markup for overhead and profit, as well as a 15 percent overhead and profit markup for its subcontractor PLP (R4, tab 37). Matcon's price for ramp drainage installation ($55,273.20), taxi light drainage, installation ($3,491.88), and saw/seal asphalt/concrete joint ($15,990.72) all included a 20 percent

the modification was "Various Change Orders – See CLINs 0007 & 0008. Extend contract due date per revised and accepted project completion date." (R4, tab 46)

**Project Free-Zones**

39. The contract put appellant on notice that the project site was an active airfield, *i.e.*, Pittsburgh International Airport in Coraopolis, Pennsylvania (R4, tab 1 at 62). The "General Notes" contained in bid document drawing C-101 depicting the project site stated that the "[p]hasing plan shall be coordinated between the Contractor and the Contracting Officer's Representative to minimize impact to operations and maximize Contractor's effectiveness" (R4, tab 2).[4] Likewise, specification paragraph 106.C required that work "be accomplished in phases in order to accommodate the airfield operations of the Base" (R4, tab 1 at 63).

40. SMSgt Abate stated that during a prebid conference, potential contractors were informed about the need for flexibility in the project schedule, in phasing of the work, and "how dynamic the work was going to be and the close coordination it was going to require" (R4, tabs 228 at 44-45, 229 at 1).[5]

41. During the period of contract performance, the government coordinated the designation of free-zones for construction work "to allow the contractor to perform work outlined in the contract" (R4, tab 88). Over the course of the contract, the government internally issued free-zone letters to ensure the availability of designated work space (R4, tabs 88 (June 28 – August 10, 2012), 105 (October 8 – October 16, 2012), 109 (October 16 – December 5, 2012), 119 (November 15 – December 17, 2012), 125 (December 11, 2012 – April 2, 2013), 149 (March 27 – April 30, 2013), 163 (May 18 – July 1, 2013), 164 (May 8 – May 17, 2013), 171 (June 17 – August 1, 2013), 184 (August 12 – October 1, 2013)).

42. The free-zones designated for the project during the period from June 28 to August 10, 2012, were as follows:

---

markup for overhead and profit (R4, tab 41 at 3). The record does not appear to include a price breakdown for west ramp inlet repair ($5,750.00).

[4] Similar language was contained in Section 02 41 00, Paragraph 1.5 of the contract, entitled "Availability of Work Areas" (R4, tab 1 at 119; finding 3).

[5] Matcon had other, prior contracts with the 171st ARW (R4, tab 229). Indeed, SMSgt Abate inquired from two Matcon employees via email dated April 11, 2012, about Matcon's interest in the apron repair project, stating "[e]ven though you are already on base working, you need to register and follow the same process as the other prospective bidders (R4, tab 3).

a. Aircraft parking spots 26-29 (east ramp) and the area (approx 140 ft wide) along aircraft parking spots 21-25 from the white line extending North East to the edge of the shoulder.

b. Aircraft parking spot 1 (west ramp) and the area from Bldg. 302 (approx 230 ft wide by 285 ft long) extending to the aircraft taxi line.

c. Aircraft parking spot 3 (west ramp) and the South East corner of the west ramp (approx 175 ft wide by 500 ft long).

(R4, tab 88)

43. SMSgt Abate stated that, at progress meetings, the parties would review upcoming work:

> to make everyone aware there was probably going to be changes made in the areas where they can work and can't work depending on the base operations. But we always tried to give them an area where they could work. We never wanted them to stop totally.

> So we always tried to work with them as close as possible, if that meant us moving planes around in order for them to work in a certain area, we accommodated the contractor as much as we possibly could.

(R4, tab 228 at 43-44)

44. When appellant was removed from working in a particular area in order to accommodate the operational requirements of an active air refueling wing, appellant was provided, or already had assigned to it, other areas in which it could perform work (R4, tab 230 at 2-3). The contracting officer coordinated with appellant to ensure interruptions were kept to a minimum and that Matcon was able to work in at least one area of the construction zone at any given time (R4, tab 229).

**Final Payment and Subsequent Claim Submission**

45. The contract performance period as extended, ended on September 6, 2013 (R4, tabs 46 at 4, 57 at 1). On December 18, 2013, Matcon submitted a Contract Progress Report indicating 100 percent contract completion (R4, tab 198 at 2-3). On

11

December 23, 2013, Matcon submitted to the government its tenth and final progress payment request, invoice number MDI0010R, in the amount of $337,839.63 (R4, tab 199). Although the contract required the contractor to submit a release of claim, appellant did not include a release with its final progress payment request (R4, tab 1 at 31, tab 199). On January 21, 2014, the government processed the December 23, 2013, invoice as the "final" contract payment, in the amount requested (R4, tab 200).

46. By email dated January 30, 2014, Matcon requested a meeting with SMSgt Abate (R4, tab 52 at 6). In a subsequent email that same day, Mr. Matesic stated, in pertinent part:

> If you're okay with meeting a bit informally, the main topic I'd like to begin discussion of is less about physical work items and more along the lines of extended mobilization for the project. . . . Full disclosure, we have a fellow working with us now that has been in the business for some time and is pretty familiar with this issue (actually, the guy has probably forgotten more than I'll ever know about construction).

(*Id.* at 5)

47. On February 11, 2014, appellant filed a claim for extended home office overhead costs in the amount of $360,742.92 (R4, tab 54). On April 12, 2014, SMSgt Abate informed Matcon via email that pursuant to the contract's Disputes clause, claims in excess of $100,000.00 must be certified as set forth in 48 C.F.R. 52.233-1 (R4, tab 56). He also informed Matcon that Master Sergeant (MSgt) Francis McNulty was assuming the role of contracting officer on the contract (R4, tab 56). Appellant resubmitted its claim dated April 29, 2014, containing the requisite certification (R4, tab 57).

48. On July 30, 2014, the contracting officer, Michael Brown, Supervisory Contract Specialist (Acting), issued a Final Decision denying Matcon's claim (R4, tab 55).

## DECISION

Matcon asserts entitlement to extended home office overhead, calculated pursuant to a modified Eichleay formula (app. br. at 16-23). The government disputes Matcon's entitlement to such costs, stating Matcon was not delayed by the government and was not placed on standby during the project (gov't br. at 17-19).

Appellant has the burden of establishing the extent of the alleged delay, a causal link between the government delay and Matcon's performance of the contract, and

12

harm to Matcon for that delay. *Kinetic Builder's Inc. v. Peters*, 226 F.3d 1307, 1316 (Fed. Cir. 2000). "Government-caused delay in performance does not automatically entitle a contractor to damages computed according to the Eichleay or any similar formula." *United Standard Industries, Inc.*, ASBCA No. 40889, 91-3 BCA ¶ 24,290 at 121,385. Application of the Eichleay formula "requires a *prima facie* showing that appellant, in fact, suffered some damage as the result of the delay." *Oxwell, Inc.*, ASBCA No. 39768, 90-3 BCA ¶ 23,069 at 115,834.

"Before using the Eichleay formula to quantify an amount of damages, the contractor must meet certain strict prerequisites for application of the formula." *Nicon, Inc. v. United States*, 331 F.3d 878, 883 (Fed. Cir. 2003). Matcon must establish "there was a government-caused delay to contract performance (as originally planned) that was not concurrent with a delay caused by the contractor or some other reason." *P.J. Dick, Inc. v. Principi*, 324 F.3d 1364, 1370 (Fed. Cir. 2003) (citing *Sauer, Inc. v. Danzig*, 224 F.3d 1340, 1347-48 (Fed. Cir. 2000)). Matcon next must demonstrate that the delay extended the original time for performance. *P.J. Dick*, 324 F.3d at 1370 (citing *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1058-59 (Fed. Cir. 1993)). Matcon also must establish a suspension of work putting it on standby. *P.J. Dick*, 324 F.3d at 1370 (citing *Interstate Gen. Gov't Contractors, Inc. v. West*, 12 F.3d 1053, 1059 (Fed. Cir. 1993)); *Columbia State Bank*, ASBCA No. 59531, 16-1 BCA ¶ 36,399 at 177,456.

**Alleged Delay**

Appellant seeks extended home office overhead for 249 additional days of performance that were added by Modification Nos. P00001, P00002, and P00003 (app. br. at 15). To establish that government delay impacted appellant's ability to complete its work, Matcon must demonstrate that the government's acts "have affected activities on the critical path." *Essex Electro Eng'rs, Inc. v. Danzig*, 224 F.3d 1283, 1295 (Fed. Cir. 2000) (quoting *Mega Constr. Co. v. United States*, 29 Fed. Cl. 396, 424 (1993)); *Fru-Con Constr. Corp.*, ASBCA Nos. 53544, 53794, 05-1 BCA ¶ 32,936 at 163,158-59 ("the delay must be to work on the critical path because only work on the critical path has an impact upon when the project is completed"); *Page Constr. Co.*, ASBCA No. 30350, 86-2 BCA ¶ 18,755 at 94,442 (contractor failed to demonstrate "by critical path or similar analysis that any delay by the Government . . . caused a delay in completion of the contract beyond . . . completion date agreed upon in by [sic] Modification").

Appellant suggests there existed a critical path by which work on the project had to proceed, stating "the government added an unquantified amount of additional repairs, thereby extending this work on the critical path" (app. reply br. at 3). Appellant provides no citation to the record evidencing the critical path. Neither appellant's initial brief nor its reply brief identify the critical path or indicate how the

alleged delays specifically impacted appellant's work along the critical path. It is insufficient to simply state there existed a critical path, without also identifying the actual path or analyzing the work along that path that allegedly impacted it. *HK&S Constr. Holding Corp.*, ASBCA No. 60164, 19-1 BCA ¶ 37,268 at 181,352 (denying appeal as appellant "makes no effort to demonstrate how any of those issues [identified] delayed the project's critical path").

The fact that the Government added work does not, without more, establish an impact to the critical path. It remains appellant's burden to establish that additional work delayed its completion of the project. The Board is not required to sort through the record and piece together the type of delay analysis necessary for appellant to prove entitlement. *Essential Construction Co. and Himount Constructors Ltd., Joint Venture,* ASBCA No. 18706, 89-2 BCA ¶ 21,632 at 108,833 (refusing "to become appellant's advocate" in appeal of delay claim). [6]

## Base Operations and Contract Performance

Appellant suggests that "the government took actions that forced Matcon to perform work out of sequence" and that "[t]he government is responsible for each of these non-negotiated *ad hoc* modifications to the Project schedule" (app. br. at 7). Appellant was put on notice that the project required it to work with the government to insure that the project did not affect flight operation of the airport (findings 39-41). The project offered a variety of locations at which appellant could work, including free-zones (finding 41). If appellant was unable to work in one location because of airfield operations, the government coordinated with Matcon to insure there were other areas wherein appellant could work (findings 41-43).

Appellant states that "due to base operations, Matcon's work was frequently restricted to only a portion of the work on each phase" (app. br. at 9). Appellant states "[b]y way of example, the government would rope off only a limited portion of the phase in which Matcon could perform its work," and that "while an operating aircraft might not have been within a particular active zone of the project, Matcon's work would still be inhibited when it had to maintain a distance from these aircraft when performing its work" (*id.*). Appellant fails to take that necessary next step to establish how those government actions actually delayed the overall progress of the project. Simply saying that government interference delayed appellant's work does not make it so and is insufficient for appellant to carry its burden. *Melka Marine, Inc. v. United*

---

[6] The government argues that there was no critical path because the contract as constructed provided appellant with a variety of places in which it could perform work (gov't br. 2, 16). The government's argument, however, does not excuse appellant's failure to present a critical path analysis in support of its claim.

14

*States*, 187 F.3d 1370, 1376 (Fed. Cir. 1999) (Eichleay claim denied where "contract continues uninterrupted, albeit in a different order than originally planned").[7]

Appellant cites *Malone v. United States*, 849 F.2d 1441, 1445 (Fed. Cir. 1988), as support for its proposition that the government's requirement that appellant's work not hinder airfield operations unreasonably delayed appellant's contract performance (app. br. at 18). In *Malone*, the Federal Circuit held that the government materially breached a contract through the contracting officer's evasive conduct that misled the contractor to perform 70 percent of the contract work in reliance on a standard the contracting officer found unacceptable. *Malone*, 849 F.2d at 1445. That obviously is not the situation here. Appellant does not allege that the government materially breached the contract through its actions coordinating contract work with airfield operations. As stated above, the contractor was on notice that its work could be impacted by airfield operations, and the government insured other work was available when airfield operations required a change in the schedule (findings 40-44).

Matcon suggests that the government's issuance of Modification No. P00003 is a recognition that the government was responsible for the delay in contract completion (app. br. at 14). Appellant notes that prior to Modification No. P00003, it submitted to the government a request for an extension based upon "additional change orders due to unforeseen conditions lengthening work schedule activities," and "required phasing in work restricted areas directed by the Base in order to accommodate their daily operations" (*id.* (quoting R4, tab 43 at 2)). Appellant then states that "[t]he Contracting Officer agreed to the extension based on the reasons set forth in Matcon's 22 May 2013 letter" (*id.*).

When asked during his deposition whether the extension of time was granted based on the letter, SMSgt Abate stated "[i]t's not based on the letter. I still had to do a contract modification. It's not official until I do the contract modification." (R4, tab 228 at 52-53)[8] Modification No. P00003 makes no mention of government-caused delay. Its description in section 14 states only: "Various Change Orders – See

---

[7] Appellant suggests that concurrent projects on the base, specifically exterior repairs on Hangar 301 and 302, interfered with its work (app. br. at 13). Other than assert that it was delayed by these concurrent projects, Matcon fails to quantify the actual delay or establish how the delay impacted the contract's critical path.

[8] SMSgt Abate was not asked specifically whether Modification No. P00003 was based upon the government's rephasing of work to accommodate daily operations. At another point during his deposition, he was asked, and answered, as follows:

> Q: I guess the reasons for agreeing to the extension,
> was it based on the reasons set forth in the letter?

CLINs 0007 & 0008. Extend contract due date per revised and accepted project completion date." (Finding 38) Moreover, CLIN 0007 (drainage work) pertains to change order work recognized only after appellant performed the contract work it would have performed during the original contract period, had it received timely delivery of the requisite aggregate (R4, tabs 46 at 3, 4, 225 at 188-195).

**Contract Time Extensions**

Matcon argues that "an extension of time granted by the contracting officer acts as (1) an administrative determination that the delay was not due to the fault or negligence of the appellant and, as (2) raising a rebuttable presumption that the government was responsible for the delay" (app. br. at 20). As support, appellant cites our decision in *Page Constr. Co.*, ASBCA No. 30266, 89-1 BCA ¶ 21,488 at 108,255, which Matcon admits was based upon an earlier decision, *Robert McMullan & Son, Inc.*, ASBCA No. 19023, 76-1 BCA ¶ 11,728, which the Federal Circuit has declared no longer is "good law." *See England v. Sherman R. Smoot Corp.*, 388 F.3d 844, 857 (Fed. Cir. 2004) ("McMullan presumption is contrary to the CDA").

In *England v. Smoot Corp.*, the Federal Circuit held:

> Thus, the mere grant by the government of a contract extension does not indicate that the government is at fault; rather, one of a number of other events external to the government could be responsible. In such a situation, a

---

> A: Yes.
>
> Q: You didn't have any disagreement at the time that the reasons set forth in the letter for extending the Project?
>
> A: Again, there were reasons we added some additional work. And the weather, I can't remember the weather yesterday let alone three years ago. So as a general statement, I would say yes, I approved their extension request."

(R4, tab 228 at 53) Modification No. P00003 makes no mention of rephasing of work to accommodate daily operations as a basis for the modification. The above deposition testimony is an insufficient basis upon which to find that Modification No. P00003 was issued because of rephasing.

16

presumption that the government is responsible for the delay is unwarranted, and nothing in the Federal Acquisition Regulations supports such an assumption.

388 F.3d at 857.[9] We decline appellant's invitation to apply the *McMullan* presumption to this appeal.

**Contractor Delay**

In September 2012, the government issued a cure notice, stating that the "delay is jeopardizing our original intent to complete and vacate this aircraft apron area before our scheduled exercise in December 2012" (finding 25). Although Matcon initially responded with assurances that the aggregate soon would be procured, ultimately the work was pushed well past Matcon's proposed project completion date of November 9, 2012, and into the spring of 2013 (findings 24-30). Even assuming the government delayed the original project during this period of time, Matcon cannot recover for what would be concurrent delay caused by its failure to procure requisite aggregate until 2013. *Sauer, Inc.*, 224 F.3d at 1348 (Fed. Cir. 2000); *Essex Electro Eng'rs, Inc.*, 224 F.3d at 1295 (Fed. Cir. 2000); *Merritt–Chapman & Scott Corp. v. United States*, 208 Ct. Cl. 639, 649–50, 528 F.2d 1392, 1397 (1976). Matcon has failed to discuss the impact of this delay in the context of a critical path analysis.

In an effort to avoid the import of its delay in acquiring aggregate, appellant argues that "concrete placement was the driving factor for Matcon's inability to perform work during the winter months, not a supposed inability to procure aggregate" (app. reply br. at 2). However, appellant offers no record citation or delay analysis to support its assertion that concrete was the "driving factor." Appellant also argues that its lack of aggregate was not impactful because, during the spring of 2013, the government decided to add a French drain to the project (app. reply br. at 2). Because appellant did not have the aggregate available for the East ramp asphalt work, the

---

[9] In *L.C. Gaskins Constr. Co.*, ASBCA No. 58550, 18-1 BCA ¶ 36,978 at 180,122, we distinguished the Federal Circuit's decision in *England v. Smoot Corp.*, and application of the *McMullan* presumption, in the context of a bilateral modification, finding a sufficient basis upon which to conclude the government delayed the project, where the government expressly recognized its delay and issued a bilateral modification as a result. Here, the government did not expressly accept sole responsibility for delay in issuing bilateral Modification No. P00001. Although the modification was based upon a differing site condition and Matcon was granted additional time, six days prior to issuance of the modification, the government issued a cure notice to appellant stating that its inability to procure necessary aggregate "has placed the revised schedule for this phase and the overall contract completion date in danger." (Finding 25)

asphalt was not cut, and as a result, the additional drainage work that would be needed was not revealed until April 2013 (R4, tabs 230, 225 at 192-195). As noted by the government, the need for a French drain would have been apparent prior to the winter shutdown had appellant not been delayed by its inability to procure asphalt aggregate (gov't br. at 16; R4, tab 225 at 188-195).

**Work Stoppage/Standby**

Matcon asserts there existed a constructive suspension of work (app. br. at 21-22; app. reply br. at 1-2). Where, as here, the contracting officer did not explicitly place the contractor on standby, a contractor must establish (1) that "the government-caused delay was not only substantial but was of an indefinite duration;" (2) that "during the delay it was required to be ready to resume work on the contract, at full speed as well as immediately;" and (3) an "effective suspension of much, if not all, of the work on the contract." *P.J. Dick*, 324 F.3d at 1371.

Eichleay damages are limited only to the period for which Matcon allegedly was on standby because of work stoppage or suspension of work, not times in which it was on the job performing the original and additional contract work. *C.E.R., Inc.*, ASBCA No. 41767, 96-1 BCA ¶ 28,029 at 139,934. "Periods of work on changes are not considered to be periods of 'standby.' Rather, the appropriate method of recovery for home office overhead during those periods is usually a percentage mark-up." *C.E.R.* 96-1 at 139,934 (citing *C.B.C. Enterprises, Inc. v. United States*, 978 F.2d 669, 675 (Fed. Cir. 1992)). Accordingly, the maximum number of days for which appellant could recover Eichleay damages is 44 out of the 249 days sought, which includes 14 days in July 2012 and 30 days Matcon claims to have been on standby from December 26, 2012, to March 4, 2013 (app. br. at 21-23).

**The 14-Day Period from July 17 to July 30, 2012**

Matcon alleges that a suspension of work based upon "defective plans is always unreasonable and compensable" (app. br. at 21-22 (quoting *Chaney & James Constr. Co. v. United States*, 190 Ct. Cl. 699, 707, 421 F.2d 728, 732 (1970)). Although the parties agree that Matcon encountered a differing site condition at the outset of contract performance, here the contracting officer did not order Matcon to stop work (finding 15). Accordingly, Matcon must establish a constructive suspension of work during this period.

The Daily Inspection Records indicate that appellant made the decision to pull workers from the project on or about July 17, 2012 (finding 19). As justification for its actions, Matcon argues it (1) encountered more repairs than were noted on the contract drawings, and (2) "could not perform work until the government directed Matcon as to the new approach to be taken for the repairs" (app. br. at 5). To the

18

extent appellant suggests that the discovery of additional repairs provided a basis for it to stop work, appellant fails to explain why it could not proceed with other project work despite the forecasted increase in work. Indeed, appellant returned to work more than a month and a half before quantities of the additional work were finalized through issuance of Modification No. P00001 (findings 20, 31).

To the extent appellant suggests that the need for a new approach to partial depth repairs provided a basis for it to stop work from July 17 to July 30, the Daily Progress Reports suggest that Matcon continued performing work during this period, specifically, "joint clean and seal," and "partial depth patching" (finding 17). The Daily Progress Reports also suggest that during the month of August, Matcon's work did not increase markedly, with Matcon performing much of the same type of work it performed during the period from July 17 to July 30, 2012, including partial depth patching (findings 20-21).

Appellant attempts to excuse its failure to submit a claim at that time because the amount set forth in Modification No. P00001 was an educated guess as to how much additional work would be required (app. br. at 6-7; R4, tab 225 at 206). Through issuance of that modification, the parties agreed appellant would be paid a fixed price for work "as directed." With regard to the estimate of additional work captured in Modification No. P00001, Major Kerns stated in his deposition "if we got into the back end of the project, and we decided that we saw that we were wrong, and we need to buy more repairs, then we could go for another modification at that point in the project" (R4, tab 225 at 207). Ultimately, the estimate of additional work set forth in the modification proved sufficient, as the parties did not enter into any additional modification "to buy more repairs."[10] Appellant has failed to meet its burden of establishing a constructive suspension of work from July 17 to July 30, 2012.

Matcon argues that it could not have included its claim for extended home office overhead during negotiation of Modification No. P00001 because the parties had no idea when contract performance would be completed (app. br. at 7). However, Major Kerns stated in his deposition that, at the time of Modification No. P00001, he anticipated the contract would be completed during the summer of 2013, which ultimately is when contract performance ended (R4, tab 225 at 216; finding 45). Moreover, all three modifications included extensions of the contract performance period. Had appellant so desired, it could have included in its cost proposals a claim for extended home office overhead based upon the period of time set forth in each of

---

[10] Unlike Modification No. P00001, Modification No. P00003 did not estimate future work. According to Mr. Matesic, Modification No. P00003 contained no "as-directed" items, rather the work set forth in that modification was discernable, "stand-alone items" (R4, tab 226 at 60).

the modifications, at the time the modifications were negotiated (*see* R4, tabs 23, 28, 46).

## The 30-Day Period in December 2012 to January 2013

Matcon argues that the government required it to be on standby from December 26, 2012, to January 31, 2013, during which time appellant worked only six days, January 4, 8-10, 29, and 30 (app. br. at 11). Appellant states it remained on standby to place concrete in a limited number of holes that appellant previously had chipped out (app. br. at 10). To prevail on this issue, appellant must establish that, during this period of time, the government required it to be able to resume work at full speed and immediately. *P.J. Dick*, 324 F.3d at 1371. The Federal Circuit has held that to satisfy this element, "the contractor must be required to keep at least some of its workers and necessary equipment at the site, even if idle, ready to resume work on the contract." (*Id.*)

Appellant states "[b]oth Matcon and Major Kerns testified that Matcon was required to perform work on any day conditions were suitable," and that both "were effectively watching the weather for days on which Matcon could perform, and Matcon performed work on every day conditions were favorable" (app. br. at 22). As support Matcon cites paragraph 30 of Asher Waldor's affidavit, wherein he states "[f]or the dates the weather would not allow Matcon to perform work during that time period, Matcon remained on standby ready to return as soon as conditions would allow" (R4, tab 238 at 4). Mr. Waldor's affidavit also contains the conclusory statement: "[d]uring that winter, Major Charles Kerns directed Matcon to be on site and perform work when weather conditions would allow" (R4, tab 238 at 3).[11]

Matcon also cites as support the deposition of Major Kerns at pages 229 to 230. However, that deposition testimony does not support Matcon's proposition. Major Kerns stated during his deposition that appellant was offered the ability to work during winter, weather permitting, and even encouraged it to the extent possible because of certain "open holes" that needed to be filled (R4, tab 225 at 230-31). Major Kerns

---

[11] Appellant fails to establish, or even allege, that Major Kerns, as the contracting officer's representative, had express authority to direct appellant to be on site and work during the winter shutdown. As the contracting officer's representative, Major Kearns was "not authorized to make any commitments or changes that will affect price, quality, quantity, delivery, or any other term or condition of the contract" (finding 6). Indeed, Major Kerns stated in his deposition he lacked "authority to obligate the Government on time or money" and that "[i]f the contractor proposes to me that they want to do something, then I need to run that through the Contracting Officer to say, this is what the contractor wants to propose to do, and seek approval to do that" (R4, tab 225 at 10, 254).

20

stated in his deposition that Matcon "had the option to come out to perform work if they wanted to" (R4, tab 230-31). Whether appellant worked during the winter on days when the weather permitted was left up to appellant; the government did not require appellant to work.

We find the deposition of Major Kerns more credible than the conclusory statement offered by Mr. Waldor in his affidavit. Major Kerns provided a detailed response to questions on the subject posed by appellant's counsel (R4, tabs 230-31). Matcon cites no contemporaneous evidence of a government requirement that Matcon be ready to resume work at full speed and immediately. The evidence proffered by Matcon is insufficient to carry appellant's burden of establishing that it was required to remain on standby during the winter of 2012 to 2013.

**SMSgt Abate Testimony**

Appellant asserts that SMSgt Abate (who was not the contracting officer who authored the final decision) "agrees that Matcon is entitled to compensation" (app. br. at 2 (citing R4, tab 228 at 64)). SMSgt Abate stated in his deposition that during the course of the contract he formed an opinion Matcon was entitled to "additional overhead expense," so during the course of contract performance he suggested that Matcon "redo" its change order cost proposal (R4, tab 228 at 64). Specifically, SMSgt Abate stated that at some point prior to issuance of Modification No. P00003, he informed the project manager for Matcon "it appears to me that you're not including everything you're entitled to, so maybe you need to go back and look at the your [sic] change order proposals and, you know, make sure you're submitting them fully and correctly" (R4, tab 228 at 67).[12]

Regardless of SMSgt Abate's opinion on whether appellant was entitled to "additional overhead expense," it is of no consequence because here, appellant has failed to meet its burden of establishing its entitlement to extended home office overhead.

---

[12] When asked during his deposition whether he had any reason to believe Matcon was not entitled to extended home office overhead, SMSgt Abate stated he could not answer that question because he was not the contracting officer who made the determination regarding appellant's claim and did not have the opportunity to specifically review the claim (R4, tab 228 at 66).

**Final Payment**[13]

In our earlier decision in this appeal, we stated the following with regard to final payment:

> The government's final payment defense is an affirmative defense on which it bears the burden of proof. *See Electro-Technology Corp.*, ASBCA No. 42495, 93-2 BCA ¶ 25,750 at 128,133. Final payment to the contractor bars claims which are submitted subsequent to the final payment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1391 (Fed. Cir. 1987). However, final payment does not bar a claim where the contracting officer knows that the contractor is asserting a right to additional compensation, even though a formal claim has not been filed. *JT Construction Co.*, ASBCA No. 54352, 06-1 BCA ¶ 33,182 at 164,464; *Navales Enterprises, Inc.*, ASBCA No. 52202, 99-2 BCA ¶ 30,528 at 150,757.

*Matcon Diamond, Inc.*, ASBCA No. 59637, 15-1 BCA ¶ 36,144 at 176,408.

We denied the government's motion, in part, because it relied upon two documents as proof of final payment that were not part of the complaint, and therefore, not properly considered with a motion to dismiss for failure to state a claim. *Matcon*, 15-1 BCA at 176,408. Those documents now are included in the Rule 4 file and the record now establishes that Matcon submitted its claim after receipt of final payment (R4, tabs 199, 200). Accordingly, for final payment not to bar appellant's claim, it must be established that, at the time of final payment, the contracting officer knew "the contractor is asserting a right to additional compensation, even though a formal claim has not been filed." *Matcon*, 15-1 BCA ¶ 36,144 at 176,408.

In *Jo-Bar Mfg. Corp. v. United States*, 210 Ct. Cl. 149, 157, 535 F.2d 62, 66 (1976) (emphasis added), the Court of Claims provided further guidance on this issue:

---

[13] The government also asserts the affirmative defenses of accord and satisfaction, waiver, and estoppel, and argues that appellant cannot recover because it failed to provide notification pursuant to the contract's Suspension of Work clause, and did not present its delay claim to the contracting officer (gov't br. at 19-23). Because of our ruling on the issue of final payment, we do not reach the government's additional arguments.

> Where the contracting officer knows, or is properly
> chargeable with knowledge, that at the time of final
> payment the contractor is asserting a right to additional
> compensation, even though formal claim therefor has not
> been filed, the fact of final payment does not bar
> consideration of a later formal claim. Nor are any special
> words or formal means of communications required in
> presenting a claim for additional compensation. Those
> doctrines do not help plaintiff, however, since *it is clear
> that, prior to final payment, the contractor must manifest
> his present intention to seek recovery under a claim of
> right.* If he does not do so, his claim is lost. (Emphasis
> added) (citing 4 MCBRIDE & WACHTEL, GOVERNMENT
> CONTRACTS § 28.200 (1975 ed.).

The record establishes that, during the entire course of contract performance, Matcon never presented, let alone formulated, a claim for extended home office overhead. At the time it submitted its final invoice - five months after the contract performance period ended on September 6, 2013 - Matcon did not inform the government of its intention to seek additional compensation (finding 45). Accordingly, prior to final payment, Matcon did not "manifest [a] present intention to seek recovery under a claim of right." *Jo-Bar Mfg.*, 210 Ct. Cl. at 157, 535 F.2d at 66.

The record likewise establishes that, at the time of final payment, the contracting officer did not know Matcon "is asserting a right to additional compensation." (*Id.*) At some point prior to Modification No. P00003, SMSgt Abate raised the issue of whether Matcon's cost proposal included all of its potential extra costs (R4, tab 228 at 67). But, as is appellant's contention – Matcon never revised its cost proposal to include additional delay costs.

Appellant states that Mr. Matesic could "not recall precise dates, but he 'discussed the issue of extended mobilization with SMSgt Abate during the course of the project'" (app. reply br. at 15 (quoting R4, tab 237 at 6)). Appellant also states that during his deposition "SMSgt Abate confirmed his knowledge of the existence of Matcon's possible claim" (app. reply br. at 15 (citing R4, tab 228 at 64)). However, these statements do not establish that, prior to submitting its request for final payment, Matcon *manifested a present intention* to seek extended home office overhead, or that the government knew at the time of final payment that Matcon *was asserting* a right to additional compensation. *Missouri Research Laboratories, Inc.*, ASBCA No. 12355, 69-1 BCA ¶ 7762 at 36,051 (contractor must "reasonably manifest to the Government its present intention to seek recovery of money based on a claim of legal right under the contract" and "if it does not do so . . . until after it has accepted what in the ordinary and natural circumstances would otherwise be reasonably construed as the

23

final payment under the contract it has not met the condition precedent to any recovery under the CHANGES clause").[14]

Appellant also cites an email from the contracting officer dated ten days *after* final payment, responding to appellant's request for a meeting (app. reply br. at 15; R4, tab 51), wherein SMSgt Abate informs Mr. Matesic:

> I [sic] free most of next week (except Monday) and have no problem meeting to discuss this.
>
> As I stated in several progress meetings, since no equitable adjustment was made by MDI at the time of the change order, at this point a claim will have to be submitted with the Contracting Officer.

(R4, tab 51 at 1) This email, however, does not establish that, *at the time of final payment*, SMSgt Abate knew Matcon *was asserting* a right to additional compensation. Moreover, "consideration of the merits of an untimely Changes claim does not waive the final payment defense." *Navales Enterprises, Inc.*, ASBCA No. 52202, 99-2 BCA ¶ 30,528 at 150,757.

The final payment doctrine limits "the contractual right to an equitable adjustment under the 'Changes' article to claims asserted by the contractor within the period of normal contract administration." *Mid-South Contractors, Inc.*, ASBCA No. 20279, 76-2 BCA ¶ 12,101 at 58,141 (quoting *Specialty Assembling and Packaging Co.*, ASBCA No. 4523 *et al.*, 59-2 BCA ¶ 2370 at 10,909).[15] The Changes clause is explicit: "[n]o proposal by the Contractor for an equitable adjustment shall be allowed if asserted after final payment under this contract" (finding 5). We note that Matcon's final payment submission did not include a release of claims, as required by the contract (finding 45). However, the absence of a release of claims submitted with final payment does not bar application of the final payment rule. *Arab Shah Constr. Co.*, ASBCA No. 60813, 17-1 BCA ¶ 36,846 at 179,539 (citing *Chronometrics, Inc.*, ASBCA No. 46581, 95-1 BCA ¶ 27,476 at 136,877). Appellant's submission likewise included no indication (1) that appellant reserved its

---

[14] In a Wunderlich Act review of that appeal, the Court of Claims found that the ASBCA was correct in holding that contractor's claims were not timely asserted before final payment. *Missouri Research Laboratories, Inc., v. United States*, 197 Ct. Cl. 1061 (1972).

[15] The Board noted that its "decision on this point was affirmed by the Court of Claims" in *Specialty Assembly and Packing Co.*, 174 Ct. Cl. 153, 355 F.2d 554 (1966). *Mid-South Contractor*, 76-2 BCA at 58,141.

right to assert a claim for extended home office overhead or (2) that it did not intend to release its claim. Appellant's claim is barred by final payment.

CONCLUSION

For the reasons stated above, the appeal is denied.

Dated: February 20, 2020

DAVID B. STINSON
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

RICHARD SHACKLEFORD
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

OWEN C. WILSON
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 59637, Appeal of Matcon Diamond, Inc., rendered in conformance with the Board's Charter.

Dated:

PAULLA K. GATES-LEWIS
Recorder, Armed Services
Board of Contract Appeals

25